Megan E. Glor, OSB No. 930178
Email: megan@meganglor.com
John C. Shaw, OSB No. 065086
Email: john@meganglor.com
Megan E. Glor, Attorneys at Law, P.C.
707 NE Knott Street, Suite 101
Portland, OR 97212
Telephone: (503) 223-7400
Facsimile: (503) 751-2071

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **STEPHANIE S. VAUGHN,** | |
| **Plaintiff,** | **Case No.  3:17-cv-01904-BR** |
| **v.** | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| **HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,** | |
| **Defendant.** | *Oral Argument Respectfully Requested* |

# TABLE OF CONTENTS

I.  Certification Under LR 7-1(a) ...................................................................1

II.  Plaintiff's Motion ...............................................................................1

III.  Introduction ....................................................................................1

IV.  Statement of Facts ............................................................................3

    A.  NW Perm Medically Retired Dr. Vaughn In March 2013
    Because Of High Absenteeism Caused By Her Asthma ............................3

    B.  Dr. Vaughn's Internist Fully Supported Her LTD Application .................4

    C.  From 2013 Through 2017, Dr. Vaughn's Treating
    Doctors Repeatedly Informed Hartford On Its Forms
    That Dr. Vaughn Was Permanently Disabled, Primarily by
    Periodic Asthma Flares, Adverse Steroid Effects, and
    Insulin Dependent Diabetes........................................................5

    D.  Dr. Fourtounis Told Hartford In 2015 In Response To Two
    Inquiries That His Patient Was Disabled From Her Occupation ...............7

    E.  Dr. Vaughn's 2013-2017 Emails To Treating Physicians,
    2017 List Of Asthma/Cellulitis Events, November 18-29, 2017
    Logs, 2017 List of Dumping Events, And Statement Corroborate
    Her Doctors' Statements...........................................................8

    F.  Hartford Consultants Acknowledged In 2013 And 2015
    That A Return To Work Would Probably Result In Excessive
    Absenteeism .......................................................................12

        1.  Hartford's Dr. Nudell concluded in 2013 that
        Dr. Vaughn's attendance at work would be disrupted
        by asthma flares ..............................................................12

        2.  Hartford's Dr. Badr asserted in 2015 that
        Dr. Vaughn's asthma attacks might require absences
        from work .....................................................................12

    G.  Hartford Confirmed Dr. Vaughn Was Permanently Disabled
    In Numerous Internal Notes From 2013 through 2016 ..........................13

        1.  Hartford confirmed in 2013, 2014 and 2015 that
        Dr. Vaughn's disability was supported by
        the medical record and would be lifelong ..................................13

2.  In 2016, Hartford noted Dr. Vaughn's benefits were expected to continue through the entire LTD benefit period, if she "survives thru that date." ..........................15

3.  In September 2017, Hartford's Dr. Joseph Rea concurred with Dr. Fourtounis' assessment of disability ...........15

H.  A Social Security Judge Approved Dr. Vaughn's Disability Claim in December 2015 ..........................................................16

I.  Hartford Terminated Dr. Vaughn's Disability Claim In October 2017, Asserting She Was No Longer Disabled According To Surveillance And That An In-Person Interview Showed She Was No Longer Disabled .....................................16

J.  Dr. Vaughn's February 2018 Appeal Summarizes Her Medical History and Includes Treating Physician Reports, Letters Of Support, Logs, Notes, And Articles Regarding Her Conditions And Medication Side Effects.....................................................17

K.  In March 2018, Two Treating Physicians Explained That Dr. Vaughn Remained Disabled From Her Occupation................................................17

V.  Argument ..........................................................................................20

A.  The Applicable Standard Of Review Is De Novo ...................................20

1.  A purported grant of discretion must be clear and unambiguous to trigger "abuse of discretion" review ................20

2.  Hartford has not met its burden of proving its policy contains a grant of discretion that triggers the "abuse of discretion" standard of review....................................20

a.  Hartford has not produced the policy and therefore has failed to prove it has been granted discretionary authority...........................................21

b.  Hartford's 2013 Certificate of Insurance does not contain an unambiguous grant of discretion in accordance with controlling law...................................22

c.  Hartford's 2011 Certificate of Insurance does not contain an unambiguous grant of discretion in accordance with controlling law...................................23

B. If The Court Reviews Hartford's Decision for "Abuse of Discretion" The Court Must Factor In Hartford's Conflict Of Interest ..................................................................24

C. Hartford Provided Dr. Vaughn 'Own Specialty' LTD Coverage..............26

D. Hartford Relied Upon Three Consultant File Reviews In Conscious Disregard Of The Fact They Misstated Facts And Reached Irrational Conclusions ........................................27

    1. Hartford's Dr. Shvarts disregarded the record to reach her irrational conclusion Dr. Vaughn was not disabled by asthma .........................................28

    2. Hartford's Dr. Fletcher disregarded the record to reach her irrational conclusion Dr. Vaughn was not disabled by diabetes or asthma ...............................31

    3. Hartford's Dr. Gause disregarded the record to reach his irrational conclusion Dr. Vaughn was not disabled from her occupation.....................................34

E. Hartford Terminated Benefits After Four Years Without A Showing Dr. Vaughn's Condition Had Improved, And Her Condition Had Declined ..........................................36

F. Hartford And Its Consultants Arbitrarily Pointed To Surveillance As Supporting Claim Termination ........................37

G. Hartford Relied Upon File Reviews That Arbitrarily Imposed An Objective Standard Of Proof Of Disability..........................38

H. Harford Ignored The Favorable Social Security Decision ........................38

VI. Conclusion..................................................................39

VII. Certificate of Compliance.....................................................39

# TABLE OF AUTHORITIES

**U.S. Supreme Court Cases**

*Cigna Corp. v. Amara*, 563 U.S. 421 (2011)........................................................................ 23

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989) ....................................... 20, 25

*Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008) ................................................. 24


**U.S. Court of Appeals Cases**

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) (en banc) ............................ 20, 25

*Beaty v. Prudential Ins. Co. of Am.*, 2009 U.S. App. LEXIS 3106 (9th Cir. Feb. 13, 2009).............. 37

*Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154 (9th Cir. 2001) ..................................... 22

*Kearney v. Standard Ins. Co.*, 175 F.3d 1084 (9th Cir. 1999)(en banc) .............................................. 20

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623 (9th Cir. 2009) ........................................... 25

*Salomaa, v. Honda LTD Plan,* 642 F.3d 666 (9th Cir. 2011) ................................................. 24, 25, 27

*Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202 (9th Cir. 2000) .......................................... 20

*Thomas v. Or. Fruit Prods. Co.*, 228 F.3d 991 (9th Cir. 2000)............................................................. 20


**U.S. District Court Cases**

*Hertz v. Hartford Life and Acc. Ins. Co.*, 991 F.Supp. 2d 1121 (D. Nev. 2014)...................... 36, 37, 38

*Laurie v. United of Omaha Life Ins. Co.*, 2017 U.S. Dist. LEXIS 35430
(D. Or. Jan. 23, 2017) ........................................................................................................................... 38

*Petrusich v. Unum Life Ins. Co. of Am.*, 984 F. Supp. 2d 1112 (D. Or. 2013)...................... 25, 27, 36

*Torres v. Reliance Std. Life Ins. Co.*, 2010 U.S. Dist. LEXIS 3470 (D. Or. Jan.15, 2010)................. 36

*Vaccaro v. Liberty Life Assur. Co.*, 2017 U.S. Dist. LEXIS 192932
(N.D. Cal.  Nov. 20, 2017) .................................................................................................................... 22

**<u>Other Authorities</u>**

29 U.S.C. § 1132(a)(1)(B) ................................................................................ 1, 20

Fed. R. Civ. Pro. 56 .......................................................................................... 1

OAR 836-010-0026 ........................................................................................... 22

Local Rule 7-1 (a) ............................................................................................. 1

Local Rule 7-2 (b) ............................................................................................. 39

## I.    CERTIFICATION UNDER LR 7-1(a)

The undersigned certifies that the parties have made a good faith effort through telephone conferences and mediation to resolve the dispute, but have been unable to do so.

## II.    PLAINTIFF'S MOTION

Plaintiff, Dr. Stephanie S. Vaughn, now moves for summary judgment under Fed. R. Civ. Pro. 56.  Dr. Vaughn seeks an order pursuant to ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), declaring that defendant Hartford Accident and Life Insurance Company ("Hartford") erred and abused its discretion by terminating Dr. Vaughn's long-term disability ("LTD") claim under the Northwest Permanente, P.C. ("NW Perm") disability plan, insured by Hartford, and ordering Hartford to reinstate Dr. Vaughn's claim effective October 19, 2017.

## III.    INTRODUCTION

Dr. Vaughn, a 53 year-old former family practice physician for NW Perm (Agreed Material Fact ("AMF") #1) became disabled from her "own occupation" on March 4, 2013, primarily due to severe asthma flares and adverse reactions to steroids used to treat her asthma. Dr. Vaughn also suffers Type 1 insulin dependent juvenile onset diabetes mellitus ("diabetes") and early stage Dupuytren contractures,[1] both of which contributed to her disability.

/ /

---

[1] Dupuytren contracture is a hand deformity in which "knots of tissue form under the skin, eventually creating a thick cord that can pull one or more fingers into a bent position" such that they "can't be straightened completely, which can complicate everyday activities such as placing your hands in your pockets, putting on gloves or shaking hands."  https://www.mayoclinic.org/diseases-conditions/dupuytrens-contracture/ symptoms- causes/syc-20371943 (accessed Feb. 8, 2019).

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** - Page 1 of 39

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

Dr. Vaughn was experiencing three to four asthma flares every three months when she left work. Each flare, including required subsequent steroid treatment, lasted two to eight weeks, causing her to be absent from work more than she was present.  The treatment also caused her to become hypomanic/manic and impaired her judgment, adversely affecting her medical decision-making ability.  Dr. Vaughn's employment was terminated on September 30, 2013.

Dr. Vaughn submitted, and Hartford approved, her STD claim.  Hartford, the LTD claims decision-maker and insurer (AMF #2,3), also approved her *own medical specialty* LTD claim and paid benefits beginning August 31, 2013 (AMF #5), upon her completion of a 180-day waiting period. After paying monthly LTD benefits for more than four years (AMF #6), Hartford terminated Dr. Vaughn's claim effective October 19, 2017.  AMF #10.  Hartford asserted her health conditions were no longer severe enough to prevent her from performing one or more of the essential duties of primary care physician and denied her appeal.  AMF #11, 12.

The applicable standard of review is the default, *de novo*, because Hartford cannot meet its burden of proving the policy, which is the governing plan document, contains a clear grant of discretionary authority to Hartford.  Hartford's Certificate of Insurance ("Certificate") expressly states there is a policy, which controls. Hartford, which has failed to produce the policy, cannot rely upon a Certificate when a policy controls.  Even if the Certificate controls, the *applicable* Certificate – which Hartford withheld from Plaintiff in discovery and from the "Administrative Record" it filed with the Court – is dated December 1, 2013.  The 2013 Certificate does not contain a grant of discretionary authority.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

Under either standard of review, Dr. Vaughn is entitled to reinstatement of her disability claim. Hartford erred and abused its discretion through its misstatements regarding the nature and treatment of Dr. Vaughn's asthma flares, arbitrary reliance on its consultants' erroneous file reviews that were contrary to the medical record, unreasonable dismissal of evidence supporting disability, arbitrary imposition of an objective standard (and false assertions Dr. Vaughn did not meet that improper standard) and violations of ERISA's "full and fair review" claim regulations. Accordingly, Plaintiff respectfully requests that this Court grant her Motion and order Hartford to reinstate and pay her LTD claim effective October 19, 2017, pay her prejudgment interest, and declare her right to future benefits.

## IV.    STATEMENT OF FACTS

### A.  NW Perm Medically Retired Dr. Vaughn In March 2013 Because Of High Absenteeism Caused By Her Asthma.

In March, 2013, NW Perm medically retired Dr. Vaughn from her half-time position as she was unable to perform her family practice physician duties because of high absenteeism due to her medical condition and her adverse effects from medication. AR 3322. NW Perm's Director of Human Resources had "met with Dr. Vaughn and her physician managers" on March 13 to discuss her returning to work, but "[i]t was agreed that given her current health status and medication it would probably not be feasible to return her to direct patient care at this point. AR 3935. Two days later, NW Perm's Service Area Director emailed Dr. Vaughn as follows:

> This is to confirm that you are not currently able to manage doing normal outpatient panel management based upon high absenteeism, secondary to your medical condition. If your short and long term prognosis is not likely to improve, I do not anticipate you can effectively return to doing normal outpatient panel management."

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** - Page 3 of 39

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

AR 3933.

Dr. Vaughn's colleague, Dr. Bonnie Gibson, a family practice physician, explained in a

by December 2017 that the cause of Dr. Vaughn's absenteeism from work was her illness:

> The constellation of Dr. Vaughn's serious medical conditions, in particular Type I
> Diabetes, asthma, and allergies, would frequently have larger than a simple
> additive effect resulting in both prolonged and frequent absences from work.
> During the cold and flu season, a respiratory illness that all physicians were
> susceptible to as health care providers might result in days to weeks of decreased
> work capacity for Dr. Vaughn. The severity of her asthma was significant enough
> to frequently require steroids to battle respiratory infections. The steroids would
> then severely impact her blood sugars as a diabetic. Subsequently, the elevated
> blood sugars would significantly impact her general ability to maintain a basic
> level of health to maintain the energy, hydration, and mental clarity to complete
> the tasks of practicing medicine. Also, the effect of the steroids and elevated
> blood sugars could cause irritability and mood swings that would impair Dr.
> Vaughn's ability to maintain the same level of professional intercourse she had on
> days when she was well. For these reasons, absences related to illnesses had to be
> frequent and extended.

AR 2219 (submitted with Dr. Vaughn's February 2018 appeal of Hartford's termination).

### B. Dr. Vaughn's Internist Fully Supported Her LTD Application.

Dr. Vaughn and her internist, Dr. Andrea Matsumura, completed Dr. Vaughn's LTD

application in March, 2013. AR 3899-3900. Dr. Matsumura stated a primary diagnosis of

"chronic asthma (severe)" and "brittle insulin dependent diabetes mellitus." AR 3899. She noted

symptoms of shortness of breath, fatigue, hyperglycemia, and irritability while on prednisone

and noted physical examination ("PE") findings of severe wheezing, increased heart and

respiratory rate, and irritability; and observed decreased spirometry values. *Id*. She noted Dr.

Vaughn was intermittently ill and was treated with high dose prednisone for her flares, which

occurred more than once per quarter. *Id.*

**PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT** - Page 4 of 39

Dr. Matsumura limited Dr. Vaughn to sitting 2 hours, standing 2 hours, and walking 4 hour daily in a general workplace environment, but "**only when <u>not</u> in a flare or on injectable or oral steroids**" AR 3900 (emphasis added).  While **on steroids, the limitations were "off work/off driving."**  *Id.* (emphasis added).  Dr. Matsumura also documented that Dr. Vaughn suffered psychiatric/cognitive impairment during periods she was taking steroids, with "angry, irritable, combative behavior."  She stated that these limitations were "lifetime."  *Id.*

### C. From 2013 Through 2017, Dr. Vaughn's Treating Doctors Repeatedly Informed Hartford On Its Forms That Dr. Vaughn Was Permanently Disabled, Primarily by Periodic Asthma Flares, Adverse Steroid Effects, and Insulin Dependent Diabetes.

In March 2013, Dr. Matsumura noted on Hartford's Attending Physician Statement ("APS") Dr. Vaughn's primary diagnosis of severe chronic asthma and secondary diagnosis of brittle insulin dependent diabetes.  AR 3899.  She listed symptoms of shortness of breath, fatigue, irritability while on prednisone, and hyperglycemia, and listed examination findings of severe wheezing, increased heart rate, increased respiratory rate, and irritable demeanor.  AR 3899.  Dr. Matsumura indicated Dr. Vaughn was disabled and noted her limitations when not in a flare or on steroids, and restricted her from working and driving while on steroids.  AR 3900.  She noted Dr. Vaughn had a psychiatric/cognitive impairment while on steroids (angry, irritable, combative behavior) and stated the limitations and restrictions were lifelong.  AR 3900.  In April 2014, Dr. Matsumura largely reiterated her prior opinion (AR 3520), noting there were no changes in the lifelong limitations and restrictions. AR 3519.

In October 2014 and September 2015, treating internist Dr. Panagiotis (Panos) Fourtounis, issued substantially the same opinion as Dr. Matsumura.  He noted a primary

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

diagnosis of severe persistent asthma and secondary diagnosis of uncontrolled insulin dependent

diabetes. AR 3531, 3710.  He noted Dr. Vaughn's condition and restrictions were unchanged and

lifetime.  AR 3532.  In 2015, he listed her symptoms as asthma flares every 2-3 months and

noted there were no changes in restriction.  AR 3711. He noted she suffered cognitive effects

(poor judgment) from steroids on both the 2014 and 2015 forms.  AR 3531, 3711.

Dr. Fourtounis completed 2 APSs in 2017. AR 3375-76, 1962-64.  In March, he repeated

the diagnoses and documented two severe steroid-resistant flares, in mid-January and early

February 2017.  He noted Dr. Vaughn's condition had not changed and that she was

intermittently ill and noted lifetime work limitations .  AR 3375-76.  In November 2017, he

noted the same diagnoses, plus diabetic neuropathy, bilateral Dupuytren's contractures, and

dumping syndrome.  AR 1962.[2]  He stated Dr. Vaughn would need lifelong treatment and

provided two sets of limitations/restrictions.  AR 1962-64. He noted that while not in a flare and

not on prednisone, Dr. Vaughn was limited by what her lung capacity and other medical issues

allowed, and that while in an acute phase of a flare and on steroids, she was limited to bed rest

with very brief home walking. *Id.* Dr. Fourtounis stated the limitations/restrictions were

indefinite.  He stated that the asthma, adverse steroid effects, and dumping remained unchanged,

but that the contractures and diabetes had retrogressed, that steroids caused severe irritability,

insomnia, impaired judgment, and impaired decision making ability, and that absenteeism caused

by her illnesses prohibited her from holding a job in primary care medicine.  *Id.*

---

[2] Dumping syndrome, also called rapid gastric emptying, can develop after bariatric surgery and
results in abdominal cramping, nausea, dizziness, vomiting and diarrhea.
https://www.mayoclinic.org/diseases-conditions/dumping-syndrome/symptoms-causes/syc-2037
1915 (accessed Feb. 14, 2019).

**PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT** - Page 6 of 39

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

In November 2017, Dr. Thilo Weissflog, an orthopedic hand specialist, stated limitations and restrictions for Dr. Vaughn's hands only, based upon her Dupuytren contractures. AR 1965-67. He noted she could not use her hands for fine manipulation (fingering, keyboarding) and that her grip was limited by pain. AR 1966. He stated the hand limitations and restrictions were permanent and that her contractures had retrogressed and now involved six fingers. *Id.* He noted in an attachment that Dr. Vaughn: was unable to type in normal manner, hunt and peck only; was unable to use her right hand to examine patients, especially abdomen, pelvic, and knee exams; was unable to use her right hand to open jars/tubes or load syringes; lacked the strength and fine motor control to perform joint injections and frequently dropped objects due to lack of grip. AR 1967.

### D. Dr. Fourtounis Told Hartford In 2015 In Response To Two Inquiries That His Patient Was Disabled From Her Occupation.

In February 2015, in response to inquiry by Hartford, Dr. Fourtounis stated Dr. Vaughn was not able to perform at a full or part-time sedentary or light job level as the "severity of her symptoms and frequent flare ups preclude her from being able to function consistently at any level". AR 3695-96. On October 28, 2015, responded to a second Hartford letter, stating he disagreed with Hartford's assertion Dr. Vaughn could perform light work on a full-time basis, stating she continued to suffer from asthma flares and chronic fatigue, was unable to perform her mostly cognitive medical duties, and lacked the required cardiorespiratory fitness level and stamina. AR 3505-06

/ /

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

**E. Dr. Vaughn's 2013-2017 Emails To Treating Physicians, 2017 List Of Asthma/Cellulitis Events, November 18-29, 2017 Logs, 2017 List of Dumping Events, And Statement Corroborate Her Doctors' Statements.**

Dr. Vaughn's 2013-2017 email communications with her treating physicians document the frequency of her asthma flares and steroid use and her ongoing disability.  AR 2994-3031, 2538-68.

Her 2017 List of Asthma/Cellulitis Events documents flares, blood glucose readings, and occasional Peak Expiratory Flow Rates ("PEF"). AR 2225-26.[3]  Dr. Vaughn had a severe flare in January 2017 that required bedrest for one week, steroid nebulizers every 2-4 hours (daytime) for 1 week, and prednisone for over 11 days. AR 2225.  Her PEF was 150 at the start of the flare, her blood glucose was regularly over 500, and she developed severe cellulitis with an abscess of her right foot*. Id.*

In February 2017, Dr. Vaughn experienced another flare (PEF 125 at the start) that required bedrest for a week and daytime nebulizers every 2-4 hours and prednisone for 3 weeks, which resulted in uncontrollable blood glucose over 500 for 5 days. *Id.*  In April, she had a "small flare" (PEF 175 at start), possibly due to incomplete resolution of the February flare.  *Id.* She was on bedrest and nebulizers for 3 days and took prednisone. *Id.*  She had another flare in June that required bedrest for 4 days, nebulizers, prednisone (with a long wean) and that resulted in blood glucose up to 300.  *Id.*  It took 2 weeks to raise her PEF to 250.  *Id.*  In August, she had a flare (PEF 125 at start), probably triggered by smoke from the Columbia Gorge fire.  AR 2226.

---

[3]  PEF is a measure of airway obstruction that varies with age, height, and sex.  **Normal PEF for Dr. Vaughn is approximately 420 L/min.**  AR 2231.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

She was on bedrest for a week, with prednisone and nebulizers, had blood glucose in the 400s and remained on prednisone for almost four weeks.  *Id.*

An October 2017 flare (PEF 150 at start) required bedrest, nebulizers for 5 days, 23 days of prednisone (including taper), and resulted in blood glucose in the 300s.  *Id.*  In November, Dr. Vaughn cleared a 6-inch plug with nebulizers and steroid inhalers (PEF 175) and did not have to start prednisone.  *Id.*  In December 2017, she had a flare that required hospitalization, with BiPAP ventilation for 12 hours and a night in the step-down critical care unit. *Id.* She was discharged on 60 mg/day of prednisone and completed a taper 31 days later.  *Id.*

Dr. Vaughn's November 2017 daily log documents the large variation in her blood glucose values (40-600 mg/dl) and her abnormally low PEFs (150-275 L/min) and provide a snapshot of her limited activities and ongoing symptoms. AR 1968-79.  During this 12-day period, she was not on prednisone, however, her blood glucose levels still ranged from 40 to 600, underscoring the difficulty she has trying to control her diabetes even when she is only on nebulizer and inhaler steroids.  *Id.*  Additionally, she suffered two insulin reactions during this period that resulted in hypoglycemia and required glucose tabs. AR 1973-74.  Her PEFs ranged from 150 to 275, even with nebulizer and steroid inhalers. AR 1968-79. Her symptoms included fatigue, nausea and vomiting, diarrhea, dumping, and almost daily wheezing/coughing that frequently required medication.  *Id.* Her activities were limited to four short walks, a trip to the store, and three instances of light yard work/gardening.  *Id.* She needed bed rest during 11 of the 12 days due to debilitating symptoms.  *Id.*

// 

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

Dr. Vaughn's 2017 List of Dumping Events documents that she suffered dumping events every month and total of 131+ events in 12 months as follows:  Jan. (9), Feb. (5), Mar. (4), Apr. (16), May (6), June (7), Jul. (4), Aug. (12), Sept. (10), Oct. (15), Nov. (20th+),  Dec. (23).  AR 2227.  She has an event every two to three days, each incapacitating her for 20 to 60 minutes. *Id.*, AR 2223-24.

In January 2018, Dr. Vaughn described worsening asthma, the adverse effect steroids have on her cognition and blood glucose, her current condition, and her daily trials and activities. AR 2220-24. She noted her flares began to last longer and required more steroids prior to her disability date. AR 2221. She explained that when taking more than 5-10 mg/day of prednisone, she was unable to filter her thoughts and exhibited poor judgment.  *Id.* Steroids cause her blood sugar to "rise dramatically", resulting in "lethargy, inattention to detail, irritability, and frequent urination" and making insulin dosing difficult.  *Id.*  She stated:

> Most days I have symptoms of asthma…Some days I take my baseline drugs of very powerful inhaled steroids and don't need much else...This may be 5-10% of the time…If my peak flow is <200 I will start taking nebulizers of more powerful steroids and bronchodilators.  On most of those days I can still get up, take walks, do a chore or two, walk up the stairs one at a time with mild shortness of breath…my blood sugars become erratic…every two hours checking it and acting on it…If one of these breathing treatments causes an expulsion of a mucous plug, I often will go outside to walk or work in the yard to keep my lungs expanded…some days, those medications don't work well and I am stuck around the house.  **I am in this medium state of flare (which I call it) 40% of the time**.

AR 2222 (emphasis added).  She described "full-blown flares":

> Medium days turned into full-blown flares seven times during 2017…peak flows are in the 150 range…actively wheezing…do the nebulizer often, like up to once an hour.  I start 80 mg of prednisone, along with all the baseline steroids and the nebulized steroids…blood sugar jumps into the 400s, 500s, or 600s. I am actively trying to breathe…coughing…not sleeping. If my peak flow gets down in the 125 range I go to the ER or urgent care to get IV steroids and more breathing

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

treatments…If I can maintain my peak flow in the 150 range I continue with this active intensive management for 2-5 days…After the first few days I am able to get up…blood sugars are erratic as prednisone is changing…very slow walks around the house…as my peak flow gets closer to baseline, I slowly begin to wean down the steroids…I am weak, my blood sugars are high and I am antsy and irritable from the side effects…a little mania…poor judgment, and inability to sleep…I can do some chores if my breath is not too short…can also take walks.  I do not drive or...make any big decisions during this time…**this phase is so long with the weaning of steroids, I would say I am in this stage 40-50% of the time.**

*Id.* (emphasis added).  She explained her diabetes has "slowly worsened",  blood sugars have become "more brittle" and she has developed peripheral neuropathy, "with numbness and poor sensation in both feet" and has mild loss of short-term memory and difficulty with word-finding. AR 2223.  Her Dupuytren contractures have worsened, causing pain and compromising typing, grasping, and fine motor control. *Id.* Bariatric surgery resulted in a 100-pound weight loss, which increased her lung volume, but did not help her asthma and resulted in dumping syndrome, with symptoms of weakness, dizziness, fainting, abdominal discomfort, and occasional rapid bowel evacuation after meals.  AR 2223-24.  Dr. Vaughn concluded:

In the 5 years since [the start of disability], my...original disabling conditions have not improved.  Moreover, since March, 2013 I have developed additional medical conditions that have added to my disability, including diabetic peripheral neuropathy in my feet; Dupuytren contractures, which limit my hand function bilaterally; dumping syndrome following gastric bypass surgery; bilateral hand tingling and numbness; and worsening fecal incontinence, [all of which] prevents me from performing my own occupation as a primary care physician.

AR 2224.

/ /

/ /

/ /

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** - Page 11 of 39

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

**F. Hartford Consultants Acknowledged In 2013 And 2015 That A Return To Work Would Probably Result In Excessive Absenteeism.**

**1. Hartford's Dr. Nudell concluded in 2013 that Dr. Vaughn's attendance at work would be disrupted by asthma flares.**

Hartford consultant Dr. Gary Nudell concluded in a file review in September 2013 (AR 3766-69) that "chronic persistent asthma" would limit Dr. Vaughn to a "full sedentary type occupation", but that she could only perform such a job when "not experiencing an asthma exacerbation." AR 3767. He stated she **"would be unable to function at any level [in] the workplace during periods of severe asthma flareups" and that her severe asthma "would likely require multiple absences from work during periods of asthma flareups."** *Id.* (emphasis added). He recommended she avoid working "in conditions that would potentially predispose [her] to infection" as it could lead to severe asthma exacerbations. *Id.* He stated she would miss work during "intermittent, unpredictable episodes of asthma flareups." AR 3768.

**2. Hartford's Dr. Badr concluded in 2015 that Dr. Vaughn's asthma attacks might require absences from work.**

Hartford's Dr. M. Safwan Badr, an internist/pulmonologist (AR 3333-35), noted Dr. Vaughn's had diabetes and severe allergic asthma and had frequent exacerbations that caused her "to miss many days of work." AR 3333. He documented uncontrolled diabetes, Dupuytren contractures and severe airflow obstruction per a January 2015 spirometry, and bariatric surgery (February 2015). *Id.* He opined Dr. Vaughn could work an 8-hour day and a 40-hour week **when she was not experiencing an asthma exacerbation or "flare-up."** AR 3334 (emphasis added). He did not state limitations for periods of asthma flares or steroid use, but stated her

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
(503) 223-7400

asthma attacks **"may require time off work"**. *Id.* (emphasis added).  He noted an uncertain

prognosis given "severe allergic asthma with frequent exacerbations".  *Id.*

### G.  Hartford Confirmed Dr. Vaughn Was Permanently Disabled In Numerous Internal Notes From 2013 through 2016.

#### 1.  Hartford confirmed in 2013, 2014 and 2015 that Dr. Vaughn's disability was supported by the medical record and would be lifelong.

**2013:**  In May 2013, claim examiner Wendy Conklin documented Dr. Vaughn's

symptoms:

> [Attending Physician] notes EE has SOB, fatigue, irritability on prednisone, severe
> wheezing, increased HR/BP, angry, irritable/combative behavior d/t [due to] prednisone.

 AR 133.  Ms. Conklin noted:

> **All of these symptoms and resulting complications would prevent EE from
> performing the essential duties and physical demands of own occ**.  **AP notes these
> are lifetime restrictions**.  EE was in talk w/ ER to RTW mod [modified] duty doing
> non-pt care, that had file review job for her; however, AP would not allow EE to do this
> work d/t behavioral issues which are a result of the high-dose steroid use…"

*Id.* (emphasis added).  She noted a return to work full time was unlikely.  *Id.*  Ms. Conklin

repeated materially the same assessment in May 2013 and July 2013, adding that Dr. Vaughn

could not work even part-time as a family practice physician.  AR 126, 123-124.

In September 2013, Ms. Conklin noted Hartford's Dr. Nudell had concluded Dr. Vaughn

was unable to function at any level in the workplace during her severe asthma flares and that her

asthma would require multiple absences from work.  AR 114-16.  She noted the medical

information supported that Dr. Vaughn would likely never return to work and her condition was

chronic.  AR 115-16.

**PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT** - Page 13 of 39

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

**2014:**  Ms. Conklin made essentially the same assessment. AR 108-119, 107.  In April, she added that Dr. Vaughn's brittle asthma was distinguished by "recurrent, severe attacks that do not respond to maximal inhaled tx [treatment]...."  *Id*. She noted: "**EE currently having a flare and could barely speak during last call**."  *Id*. (emphasis added).

In September, claim examiner Edward Ebeling conducted a "Milestone Call" with Dr. Vaughn.  AR 105.  She reported being "Ok" between flares, able to perform activities of daily living.  *Id*.  She reported viruses generally caused her flares and that she was having 4-6 flares per year, a decrease since leaving work.  *Id*.  She stated a flare incapacitated her for 3 to 4 day, and she took steroids for weeks thereafter, compromising behavior and judgment.  *Id*.  She stated flares had resulted in poor work attendance.  *Id.*

**2015:**  In February 2015, Hartford noted that treating pulmonologist, Dr. Rettman, reported spirometry results had "notably decreased from 8 months ago."  AR 97-98.  In September 2015, claim examiner Anne Kelly conducted  a "Milestone Call" with Dr. Vaughn. AR 88-89.  Ms. Kelly noted diabetes had caused Dupuytren contractures and that Dr. Vaughn had undergone bariatric surgery in March 2015, resulting in weight loss, but no improvement in asthma. AR 88.  In October 2015, claims examiner Colleen Hamric noted that according to Dr. Fourtounis (AR 3710-11), Dr. Vaughn continued to have "cognitive effects from prednisone with resulting poor judgment".  AR 87-88.

/ /

/ /

/ /

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

>    2.  **In 2016, Hartford noted Dr. Vaughn's benefits were expected to continue through the entire LTD benefit period, if she "survives thru that date."**

In January 2016, Hartford's Rehabilitation Claim Management unit concluded it was unlikely Dr. Vaughn would be able to perform her occupation reliably with her asthma flares. AR 69-70.  In June, Hartford noted two medical reviews had found severe impairments.  AR 60-61. She noted extensive review showed Dr. Vaughn was disabled form her "own light occupation," that prednisone treatments affected diabetic control and that she would likely never return to work.  AR 61-62.  Hartford documented **benefits would be expected to continue through the duration of the LTD benefit period, if Dr. Vaughn "survives thru that date"**. AR 61-62 (emphasis added).

>    3.  **In September 2017, Hartford's Dr. Joseph Rea concurred with Dr. Fourtounis' assessment of disability.**

In September, 2017, Hartford physiatrist Dr. Rea noted Dr. Vaughn's physical functionality depended on whether she was in or out of an asthma flare:

> Absent flares, there appears to be, based on the clinical evidence available, normal physical findings along with reasonably normal mild-to-moderate activity levels, as judged by the video surveillance suggesting that during those normal and majority of times there would be no indication for any significant physical impairment or resulting restriction or limitation.

AR 3136.  Dr. Rea concluded:

> Based on the unpredictable onset of asthmatic flares, **there would be indication for limitation which would be, I believe, in line with Dr. Fourtounis's approach for bedrest and note to limit activity during the time of the flares**.

*Id*. (emphasis added).[4]

---

[4] As discussed below, Hartford pointed to Dr. Rea's conclusion to justify claim termination.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

### H.  A Social Security Judge Approved Dr. Vaughn's Disability Claim in December 2015.

A Social Security Administrative Law Judge ("ALJ") approved Dr. Vaughn's disability ("SSDI") claim in December, 2015, concluding she had been disabled from **all substantial gainful employment** since March 2, 2013, because of frequent asthma flares and adverse effects of prednisone, used to treat the flares.  AR 3313, 3322, 3326.  The ALJ noted Dr. Vaughn experienced 1-2 asthma flares per quarter that required treatment with prednisone and caused her to be bed-bound for several days. AR 3322.  He noted prednisone made her "hyper and mean", caused poor concentration, made her prone to mistakes, and destabilized her blood sugar. *Id.*

The ALJ found Dr. Vaughn's testimony consistent and proportional to her impairments, and concluded pulmonary function testing was consistent with chronic asthma, and that her diabetes was uncontrolled because of prednisone treatment. AR 3322-23. The ALJ found "no inconsistencies that would bring the claimant's credibility into serious question." AR 3324.

### I.  Hartford Terminated Dr. Vaughn's Disability Claim In October 2017, Asserting She Was No Longer Disabled According To Surveillance And That An In-Person Interview Showed She Was No Longer Disabled.

In October, 2017, Hartford terminated Dr. Vaughn's LTD claim, effective October 19, 2017 (AR 4019-24) and based its termination upon Dr. Rea's review.  AR 4023.  Hartford also asserted surveillance obtained by Hartford on four days in the Spring 2017 and an in-person interview showed Dr. Vaughn was not disabled from her occupation.  AR 4022.

/ /

/ /

/ /

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** - Page 16 of 39

**J.  Dr. Vaughn's February 2018 Appeal Summarizes Her Medical History and
Includes Treating Physician Reports, Letters Of Support, Logs, Notes, And
Articles Regarding Her Conditions And Medication Side Effects.**

Dr. Vaughn submitted a lengthy letter of appeal and a large volume of supporting
medical records, reports, statements, logs and articles**.** AR 323-418 (letter), 419-1234 (exhibits).
The appeal asserted Hartford misinterpreted Dr. Rea's Report by failing to acknowledge that Dr.
Vaughn could only fulfill physical aspects of her occupation when she was not suffering from
the effects of her asthma flares.  AR 365-67.

It explained that Dr. Rea noted Dr. Vaughn's activity during a flare would be bedrest and
limited activity "in line with Dr. Fourtounis's approach". AR 3136; *See* p. 15 *supra*.  The appeal
asserted Hartford ignored its consultants' reports and its own prior memos.  AR 367-375.  It
asserted Hartford had issued internal memos that created false perceptions and that Hartford's
interview of Dr. Vaughn was performed under the false perception that the limitations and
restrictions that were applicable during an acute asthma flare, as documented on Dr. Fourtounis'
March 6, 2017 APS (AR 3375), applied all the time. AR 375-382.  The appeal asserted
Hartford's surveillance and interview corroborated Dr. Vaughn's disability claim. AR 386-88.  It
noted the SSDI claim approval (AR 388-89) and explained Dr. Vaughn had developed
Dupuytren contractures and dumping syndrome since leaving work in 2013, increasing her level
of disability.  AR 390-91.

**K.  In March 2018, Two Treating Physicians Explained That Dr. Vaughn
Remained Disabled From Her Occupation.**

Dr. Treat, Dr. Vaughn's immunologist, explained in February 2018 that Dr. Vaughn has
"a chronic long-term disability from severe persistent asthma, adverse side effects from steroid

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

treatment for her asthma flares, and insulin dependent diabetes mellitus". AR 2212. He stated she

had had eight asthma flares in 2017 and was hospitalized for one flare. *Id.* Dr. Treat stated Dr.

Vaughn was "bedbound for a few days to 1-2 weeks and homebound for 1-2 to 3-4 weeks" when

experiencing a flare, but that between flares, she was able "to do activities as tolerated". *Id.* He

reported adverse "side effects from steroids including anger, impatience, poor impulse control

and poor judgment". *Id.* He noted Dr. Vaughn had "experienced all of these side effects while

taking steroids during a flare" and stated her "steroid use (including tapering) during a flare

varies between 2-3 weeks to 5-6 weeks". *Id.* He concluded her conditions disabled from her

occupation, including "just on absenteeism alone". AR 2213.

　　　　In February 2018, Dr. Fourtounis wrote:

> Over the past 5 years, Dr. Vaughn has averaged a severe asthma flare every 1-2
> months that required prednisone and/or steroid nebulizer treatment for a
> minimum of 2-3 weeks to as long as 6-8 weeks. Dr. Vaughn's steroid treatment,
> in turn, causes her to experience irritability, aggressiveness, hypomania, and lack
> of judgment. Her steroid treatment also wreaks havoc with her diabetic
> management and causes uncontrollable hyperglycemia.

AR 2214. He described the effect of flares and steroids on her activities:

> During the acute phase of an asthma flare, which may last a week or more, Dr.
> Vaughn's wheezing, dyspnea, and high doses of prednisone (60-80 mg. daily)
> essentially limit her to bedrest and minimal household activity. Once Dr.
> Vaughn begins to recover from the acute phase of a flare, she starts to taper her
> prednisone, which may take anywhere from 2-3 weeks to 6-8 weeks depending
> upon the severity of the flare and the response of the flare to the prednisone. As
> Dr. Vaughn recovers from the acute phase of an asthma flare and her dyspnea
> decreases, she is able to become more active physically, even though she may
> still be tapering the prednisone and still be experiencing the adverse prednisone
> effects.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

AR 2214-15. Dr. Fourtounis noted that during the acute phase of a flare she sometimes had

severe airway obstruction.  AR 2215.[5]

Dr. Fourtounis noted steroids made Dr. Vaughn's blood glucose uncontrollable.  *Id.*[6]  He

reported her levels while on steroids ranged up to 600-700 mg/dl and contributed to her fatigue,

required daily changes in insulin dosing, and put her at risk of hypoglycemia.  *Id.*  He

documented uncontrolled diabetes.  *Id.*  Dr. Fourtounis explained Dr. Vaughn's health was worse

than it had been in March 2013, when Hartford determined she was disabled:

> Dr. Vaughn's restrictions/limitations vary depending on whether she is out
> of an asthma flare and steroid free or in an asthma flare and taking steroids.
> However, the frequency of Dr. Vaughn's severe asthma flares, her steroid
> treatment, her subsequent adverse personality and behavior changes caused
> by steroids and her fatigue from dyspnea and steroid-induced
> hyperglycemia result in an absenteeism rate that precludes her from
> performing her job as a primary care physician. In addition, since she
> initially became disabled, Dr. Vaughn has experienced a partial loss of
> hand function by Dupuytren contractures and developed dumping
> syndrome.  All of Dr. Vaughn's current conditions combine to make her
> present health status worse today that it was in March 2013...

AR 2218.

/ /

/ /

/ /

/ /

/ /

---

[5] Dr. Fourtounis noted Dr. Vaughn's PEF between flares was 200-300 L/min, while normal for a
woman of her age and height was over 400 L/min.  AR 2215.
[6] Her HbA1c value (a test indicating the average blood glucose level over the prior 2-3 months)
had continually been abnormal. The American Diabetic Association ("ADA") recommended
level is 7%.  *Id.*

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

## V.    ARGUMENT

### A.  The Applicable Standard Of Review Is *De Novo*.

#### 1.    A purported grant of discretion must be clear and unambiguous to trigger "abuse of discretion" review.

A plan fiduciary's denial of benefits challenged under ERISA § 502(a)(1)(B), 29 U.S.C.

§ 1132(a)(1)(B), is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary

discretionary authority to determine eligibility for benefits or to construe the terms of the plan."

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Kearney v. Standard Ins. Co.*,

175 F.3d 1084, 1090 (9th Cir. 1999)(en banc).  Any grant of discretion must be clear and

"unambiguous" to trigger the "abuse of discretion" standard of review  *Id*.  The Ninth Circuit has

stated with respect to a purported grant of discretion, "we see great value in clarity."  *Sandy v.*

*Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1206 (9th Cir. 2000).  Thus, the "starting point"

in determining the applicable standard of review is whether the terms of the ERISA plan

"**unambiguously** grant discretion to the administrator." *Abatie v. Alta Health & Life Ins. Co.*,

458 F.3d 955, 962-63 (9th Cir. 2006) (en banc) (emphasis added).

#### 2.    Hartford has not met its burden of proving its policy contains a grant of discretion that triggers "abuse of discretion" review.

Hartford bears the burden of proving the existence of a grant of discretionary authority in

the controlling plan document.  *See Thomas v. Or. Fruit Prods. Co.*, 228 F.3d 991, 994 (9th Cir.

2000) (citing *Kearney*, *supra*, 175 F.3d at 1089).  It does not meet that burden.

/ /

/ /

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

**a. Hartford has not produced the policy and therefore has failed to prove it has been granted discretionary authority.**

Hartford has provided in its "Administrative Record" a Certificate of Insurance, Revised January 1, 2011 ("2011 Certificate"). AR 3146-3180. The 2011 Certificate names the Policyholder" as a trust and the "Participating Employer" as "NORTHWEST PERMANENTE, P.C." AR 3152. The 2011 Certificate further states:

> **We have issued The Policy** to the Policyholder. Our name, the Policyholder's name, the Participating Employer's name, The Policy Number and the Participating Employer's Account Number are shown above. **The provisions of** the Participating Employer's **coverage under The Policy**, which are important to You, **are summarized in this certificate** consisting of this form and any additional forms which have been made a part of this certificate. This certificate replaces any other certificate we may have given to You earlier **under the Policy**. **The Policy alone is the only contract which payment will be made.** Any difference between The Policy and this certificate will be settled according to the provisions of The Policy on file with Us at Our home office. The Policy may be inspected at the office of the Policyholder.

AR 3152 (emphasis added).

Dr. Vaughn's counsel requested of Hartford in discovery the LTD policies in effect from January 1, 2011 to January 1, 2018, and the LTD policy in effect on March 4, 2013, Dr. Vaughn's date of disability. *See* Doc. #32-3, p. 12, #17 (Pl. First Req. for Prod.), Doc. #32-7, p. 4, #1 (Pl. Second Req. for Prod.).[7]  In response, Hartford asserted, "all responsive policy documents are contained in the administrative record that has been produced" (Doc. 32-4, p. 15, #17 (Def. Resp. To Pl. First Req. for Prod.)) and "all responsive documents are contained in

---

[7] Her counsel also requested the policy in two letters, in December, 2017 (AR 3091-92) and January, 2018.  AR 3087.  Hartford stated in an internal note dated January 18, 2018 that the Certificate is the "actual policy/plan" Hartford used to "adjudicate" Dr. Vaughn's LTD claim and that Hartford has no additional "plan/policy aside from what we provided to atty." AR 19.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

policy files that [have] already been produced for the relevant time period to the plaintiff's claim". Doc. 32-8, p. 3, #1 (Def. Resp. To Pl. Second Req. for Prod.). Hartford stated in its Opposition to Plaintiff's First Amended Second Motion to Compel Production that the 2011 Certificate "governs the present dispute." Doc. #41, p. 5. Hartford has never produced the policy.

The policy is the controlling document. It governs the payment of benefits. Because Hartford has failed to produce the policy, it is unknown whether the Certificate is part of the policy, or whether the policy contains a provision stating discretion is granted to any entity, or to no entity. It is unknown what state's laws govern or whether any purported grant of discretion is subject to any one of the approximately 25 existing states' bans on discretionary clauses, including Oregon's. OAR 836-010-0026. Hartford cannot establish whether the policy was renewed on or after the date of any applicable ban, including March 12, 2013, the date of Oregon's ban. Hartford has failed to prove entitlement to discretion.

### b. Hartford's 2013 Certificate of Insurance does not contain an unambiguous grant of discretion.

The Ninth Circuit holds that because ERISA-governed disability benefits do not vest, "the policy in effect at the time benefits were terminated control[s]..." *Vaccaro v. Liberty Life Assur. Co.*, 2017 U.S. Dist. LEXIS 192932 at *24 (N.D. Cal. Nov. 20, 2017) (citing *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1160-61 (9th Cir. 2001)). Accordingly, even assuming the Certificate controls – despite the absence of the policy to which it expressly refers – the 2013 Certificate, which was in effect at the time of Hartford's October, 2017 claim termination, controls. *See* Vaughn Aff. Ex A, p. 1, 6.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** - Page 22 of 39

The 2013 Certificate does not contain a discretionary clause.  *See* Vaughn Aff., Ex. A, pp. 1-35.  A **separate document**, entitled "ERISA INFORMATION" (*Id.*, pp. 36-41), **follows** the 2013 Certificate and **follows** an Amendatory Rider.  *Id.*, pp.1-35.  It states:

> The benefits described in your booklet-certificate (Booklet) are provided under a group insurance Policy (Policy) issued by the Hartford Life and Accident Insurance Company (Insurance Company) and are subject to the Policy's terms and conditions.  The Policy is incorporated into, and forms a part of, the Plan. The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy.  The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

*Id.* p. 36. The Supreme Court held in *Cigna Corp v. Amara,* 563 U.S. 421, 436 (2011), that a summary plan description that contains information "about the plan" is not itself "part of the plan").  The "ERISA INFORMATION" provides information about the Plan, but is not part of the Plan.

Even if the "ERISA INFORMATION" document is deemed part of the 2013 Certificate, its discretionary clause does not satisfy the Ninth Circuit's clarity requirement.  It grants Hartford discretionary authority **based upon the provisions of a Policy (***Id.***, p. 36), which** Hartford has failed to produce.  It does not grant discretion regarding the 2013 Certificate.  *Id.* Accordingly, the applicable standard of review is *de novo.*

      **c.  Hartford's 2011 Certificate of Insurance does not contain an unambiguous grant of discretion in accordance with controlling law.**

The 2011 Certificate also does not contain a clear, unambiguous grant of discretion.  It states Hartford has "full discretion and authority to determine eligibility for benefits and to

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

construe and interpret all terms and provisions" of the Policy and that this provision applies

where the interpretation of the Policy is governed by ERISA.  AR 3169.

Here too, however, the discretionary clause in the 2011 Certificate (AR 3169) and the

discretionary clause in the separate "ERISA INFORMATION" (AR 3181) give Hartford

discretionary authority **based upon the provisions of a Policy**, which is not in Hartford's

"Administrative Record."

Neither the discretionary clauses in the 2011 Certificate (AR 3169), which Hartford

contends is the governing LTD Plan document, nor the discretionary clause in the "ERISA

INFORMATION" document (AR 3181) grant Hartford discretionary authority regarding

**provisions of the 2011 Certificate.** They only give Hartford discretionary authority **regarding**

**the provisions of the policy**.  Accordingly, the applicable standard of review is *de novo*.

### B.  If The Court Reviews Hartford's Decision for "Abuse of Discretion" The Court Must Factor In Hartford's Conflict Of Interest.

If the Court concludes the applicable standard of review is "abuse of discretion", the

Court upholds the administrator's decision unless it is "(1) illogical, (2) implausible, or (3)

without support in inferences that may be drawn from the facts on the record and is applied "with

the qualification that a higher degree of skepticism is appropriate where the administrator has a

conflict of interest"."  *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir.

2011) (internal quotation marks omitted).  In *Metropolitan Life Ins. Co. v. Glenn,* 554 U.S. 105,

115 (2008), the Supreme Court explained:

> ERISA imposes higher-than-marketplace quality standards on insurers. It sets
> forth a special standard of care upon a plan administrator, namely, that the
> administrator "discharge [its] duties" in respect to discretionary claims processing

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

"**solely in the interests of the participants and beneficiaries**" of the plan, [29 U.S.C.] §1104(a)(1).

*Id.* (emphasis added, citing *Firestone Tire, supra,* 489 U.S. at 113).

*Firestone Tire* holds a structural "conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.' 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187, Comment *d* (1959)). *See Salomaa, supra,* 642 F.3d at 674. Structural conflicts are "weigh[ed] more or less heavily as factors in the abuse of discretion calculus." *Abatie, supra,* 458 F.3d at 966-67 (reviewing court must always consider "inherent conflict that exists when a plan administrator both administers the plan and funds it."); *Petrusich v. Unum Life Ins. Co. of Am.,* 984 F. Supp. 2d 1112, 1116 (D. Or. 2013) ("Even when a plan provides an unambiguous grant of discretion to the administrator, a heightened standard may be required because of the administrator's conflict of interest.").

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629-30 (9th Cir. 2009), "provide[s] guidance for applying the abuse of discretion standard when there is a structural conflict of interest," holding that a "determination of whether a plan administrator abused its discretion turns on a consideration of 'numerous case-specific factors, including the administrator's conflict of interest", the "quality and quantity" of the medical evidence, whether the administrator had the claimant examined or relied instead on a paper review of medical records, and whether the administrator considered a contrary SSA disability determination."

The following factors show Hartford's conflict of interest resulted in an arbitrary termination of Dr. Vaughn's claim and an arbitrary denial of her appeal:

1. Hartford chose not to have Dr. Vaughn examined, but to instead commission file reviews; Hartford then relied upon the file reviews knowing they provided no sound reason in

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** - Page 25 of 39

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
(503) 223-7400

rejecting the treating doctors' emphatic support of Dr. Vaughn's claim of disability and the record as a whole.  *See* pp. 27-36, *infra*.

2. Hartford terminated Dr. Vaughn's claim after approving it for more than four years, knowing her condition had not improved, and had declined. AR 4019-24, 2218.  *See* pp. , 36-37 *infra*.

3. Hartford relied upon the file reviews, knowing two of three of them improperly imposed an "objective" standard upon Dr. Vaughn's proof.  *See* p. 38, *infra*.

4. Hartford ignored and discounted the Social Security Administration's finding Dr. Vaughn was totally disabled, while reaping the benefit of a reduction in its monthly liability.  *See* p. 35, *infra*.

5. Hartford's conflict of interest is itself a factor to be weighed. *Glenn*, 554 U.S. at 110.

**C.  Hartford Provided Dr. Vaughn 'Own Specialty' LTD Coverage.**

Dr. Vaughn is considered "Disabled" under the LTD Plan if due to "sickness" she is "prevented from performing one or more of the Essential Duties" of her occupation (AR 3169-70) and, as a result, her current monthly earnings are less than 80% of her indexed pre-disability earnings.  *Id*., AMF #13.  Dr. Vaughn's "own occupation" is defined as her practice as as a family practice physician.  AR 3173.  An "Essential Duty" is one that is "substantial, not incidental;" "fundamental or inherent to the occupation;" and that "cannot be reasonably omitted or changed."  AR 3170, AMF #14.  **Dr. Vaughn's "ability to work the number of hours in [her] regularly scheduled work week is an Essential Duty"** of her "own occupation."  *Id.* The Plan does not contain a provision requiring the claimant to prove her disability through through **objective evidence**.  *See* Sec. G, p. 38, *infra*. and AR 3165-66, 3169-70.

/ /

### D. Hartford Relied Upon Three Consultant File Reviews In Conscious Disregard Of The Fact They Misstated Facts And Reached Irrational Conclusions.

This Court has observed:

> A plan administrator is not required to examine the claimant. *Kushner v. Lehigh Cement Co.*, 572 F. Supp. 2d 1182, 1192 (C.D. Cal. 2008)("ERISA also does  not require that an insurer seek independent medical examinations."). Nevertheless, one factor that courts consider when determining if a plan administrator abused its discretion, particularly in cases where the administrator has a conflict of interest, is whether the plan administrator conducted only a paper review of the claimant's file. *Salomaa*, 642 F.3d at 676 ("An insurance company may choose to avoid an independent medical examination because of the risk that the physicians it employs may conclude that the claimant is entitled to benefits. The skepticism we are required to apply because of the plan's conflict of interests requires us to consider this possibility in this case.").

*Petrusich*, 984 F. Supp. 2d at 1122 (additional citations omitted).  This Court concluded in *Petrusich,*"...there was sufficient evidence in the record to support Petrusich's contentions, including the opinions of her treating physicians. Under the circumstances, Unum had a fiduciary duty to engage in a meaningful dialogue with Petrusich and to request an IME or whatever additional evidence it deemed necessary to confirm or to deny Petrusich' assertion of cognitive impairment." *Id*. at 1123.

Dr. Vaughn's medical record overwhelmingly showed she would never practice medicine again, even on a part-time basis, due to her severe disease.  Hartford had concluded that it was likely she would never return to work.[8]  The record showed at the time of Hartford's termination that her condition had worsened since the onset of her own occupation

---

[8] Hartford even contemplated making a settlement offer to Dr. Vaughn's in 2013, but concluded her risk of mortality was too high to justify doing so.  AR 126.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

disability in 2013.  In these circumstances, Hartford "had a fiduciary duty to engage in a meaningful dialogue with [Dr. Vaughn] and to request an IME or whatever additional evidence it deemed necessary to confirm or to deny [her] assertion of cognitive impairment." *Id*.  Hartford commissioned three file reviews in its review of Dr. Vaughn's appeal and relied upon their patently false conclusions.

> **1. Hartford's Dr. Shvarts disregarded the record to reach her irrational conclusion Dr. Vaughn was not disabled by asthma.**

Dr. Shvarts limited her review to Dr. Vaughn's severe persistent asthma.  AR 279.  She acknowledged the medical record was "consistent and credible" that Dr. Vaughn had severe persistent asthma, which was difficult to control.  AR 281.  Yet she asserted the medical record did not support consistent restrictions and limitations related to asthma.  AR 286.  Her file review is riddled with errors.  Underlying her irrational conclusion is her misstatement of Dr. Vaughn's age as 61, instead of 52.  AR 277.  This error caused Dr. Shvarts to use the wrong PEF "normal" value of 300 for Dr. Vaughn (*id.*), whereas normal for Dr. Vaughn is over 400.  AR 2231.  This error minimizes the extent of dyspnea during the acute phase of asthma flares.

Dr. Shvarts asserted there was no "objective evidence" to support the frequency and duration of Dr. Vaughn's flares, as she managed most of her flares by herself at home.  AR 281.  Based upon this assertion, she dismissed evidence of flares noted by Dr. Vaughn in emails, her 2017 list of asthma/cellulitis events, and her November, 2017 daily logs.  AR 277-286.  Dr. Shvarts asserted Dr. Vaughn had no limitations and restrictions related to her asthma. AR 281, 283.  Dr. Shvarts also dismissed the letters of treating physician Dr. Fourtounis, documenting the frequency and duration of Dr. Vaughn's flares. AR 2212-13, 2214-18, 277-286.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

Dr. Shvarts erroneously rejected Dr. Vaughn's claim she was completely incapacitated for 2-3 weeks during and after a flare asserting it was was contradicted by the medical record. AR 281.  She ignored or overlooked the sequence of events, outlined by Dr. Treat and Dr. Fourtounis, of a flare:  An acute phase of several days to a week or more, during which dyspnea and high dose steroids limit Dr. Vaughn to bedrest and minimal household activity, followed by a phase during which she can be more physically active as she recovers from dyspnea and tapers the steroids (recovery phase), even though she is still experiencing the adverse cognitive/behavior side effects of steroids.  *See* AR 2212, 2214-15.

Dr. Shvarts mistakenly stated Dr. Vaughn's oxygen saturation ("SpO2") was normal on room air at 98% when she arrived at the hospital in December 7, 2017.  AR 282. Dr. Vaughn's actual SpO2 on admission was 95% on room air (AR 1569) and her SpO2s during her hospital stay ranged between 94-98% on room air (AR 1562-63). Dr. Shvart's mistake minimized the severity of Dr. Vaughn's asthma.

Similarly, she asserted that "at no time" was Dr. Vaughn "documented to be incapacitated either physically or mentally" during her the admission.  AR 282.  The mere fact that Dr. Vaughn was admitted to the hospital indicates a degree of incapacitation, and the hospitalist who admitted Dr. Vaughn, documented that she presented with worsening shortness of breath and asthma symptoms after being unable to turn herself around at home with 80 mg of prednisone and nebulizers.  AR 1575, 1581.  Dr. Shvarts' assertions also fail entirely to address the fact Dr. Vaughn has a well-documented cognitive disability in judgment and medical decision-making while on steroids.  AR 2212, 2214.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

Dr. Shvarts asserted the "medical record does not support any consistent restrictions and limitations" regarding asthma. AR 282. Dr. Shvarts also asserted there was **no objective evidence** Dr. Vaughn could not function physically or mentally during asthma flares. *Id.*. She ignored that Dr. Vaughn suffered dyspnea in the acute phase of a flare, resulting in extreme shortness of breath and PEFs less than 50% of normal that limited physical function. AR 2225-26. She ignored that Dr. Vaughn was medically retired because of the high absenteeism caused by her asthma flares and steroid treatment (AR 3933), and that her overall condition had declined. AR 2218. She ignored the adverse effects of steroids, including emotional instability and irritability, euphoria, impaired cognition, mania, mood swings, personality changes, verbal memory loss, and deficits in memory retention, attention, concentration, mental speed and efficiency, and occupational performance (AR 1116-17) that precluded her from working while taking steroids (AR 3935). AR 2212-14, 2218.

Dr. Shvarts erroneously asserted the "medical record" does not support "mental status changes or highly elevated blood sugars in the 900 range while on prednisone." AR 284. Her assertion refers to Dr. Vaughn's mentioning during Ms. Still's interview in May 2017 that when she took prednisone, "my blood sugars go into the high hundreds, like 900." AR 3192. The medical records show blood glucose from 300 to 700: AR 2225-26 (Dr. Vaughn's 2017 list of Asthma/Cellulitis events), AR 2215 ((Dr. Fourtounis, 2/8/18 letter, 600-700 while on steroids), AR 1564 (12/17 hospital admission, 325-425), AR 1968-79 (Dr. Vaughn's November 2017 daily logs, showing values up to 600). The numbers were wildly high. However, the material fact is not precisely how high her blood glucose reached, but rather the fact that her diabetes was and is

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
(503) 223-7400

rendered uncontrollable by her steroid treatment.  AR 2215.  Dr. Vaughn's colleague, Dr.

Gibson, described in December 2017 Dr. Vaughn's irritability, mood swings, and lack of mental

clarity at work while on steroids.  AR 2219.  *See also* AR 2212, 2214 (Dr. Treat and Dr.

Fourtounis, describing Dr. Vaughn's irritability, aggressiveness, hypomania, and lack of

judgment while on steroids).

Inexplicably, Dr. Shvarts concluded that Dr. Vaughn had no limitations or restrictions

due to her severe persistent asthma and that she could work full-time, missing work just 2 to 3

times per year for 1 to 2 days each time due to asthma flares.  AR 284.  Her assertion was in

disregard of the medical record, including, to cite just one example, Dr. Fourtounis' February

2018 letter stating Dr. Vaughn had averaged a severe flare every 1 to 2 months over the past 5

years "that required prednisone and/or steroid nebulizer treatment for a minimum of 2-3 weeks to

as long as 6-8 weeks", which in turn caused "irritability, aggressiveness, hypomania, and lack of

judgment" and "uncontrollable hyperglycemia.  AR 2214.

**2.  Hartford's Dr. Fletcher disregarded the record to reach her irrational
conclusion Dr. Vaughn was not disabled by diabetes or asthma.**

Dr. Fletcher, an endocrinologist, stated she was assessing Dr. Vaughn's limitations and

restrictions, from an endocrinology standpoint.  AR 287.  She concluded that Dr. Vaughn could

work 40 hours per week without limitations or restrictions, other than brief breaks of 5 to 10

minutes up to 3 times per day to check and treat her blood sugar, and that due to asthma, might

be miss work 1 to 3 days at a time up to 4 times per year.  AR 292.  Her report is also

error-filled and arbitrary.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

*Like Dr. Shvarts*, Dr. Fletcher failed to distinguish between the limitations and restrictions that applied to Dr. Vaughn during the initial acute phase (up to a week) of an asthma flare, when her dyspnea and fatigue limited her to bedrest and minimal household activity, and those that applied during the recovery phase (AR 2212-15).  AR 290-292.[9]  *Also like Dr. Shvarts*, Dr. Fletcher commented that Dr. Vaughn's report of blood glucose levels around 900 (AR 3192) was suspect, and implied Dr. Vaughn may not be credible. AR 291.  But, again the material fact is that her diabetes was and is rendered uncontrollable by her steroid treatment.  AR 2215.

*Like Dr. Shvarts*, Dr. Fletcher asserted there was "**no objective evidence**" supporting "impaired cognition, agitation, aggression, or behaviors that would interfere with her ability to perform her job as a physician in a professional, acceptable manner".  AR 291.  This ignored Dr. Gibson's letter documenting Dr. Vaughn's irritability, mood swings, and lack of mental clarity at work while on steroids (AR 2219), Dr. Treat's letter documenting Dr. Vaughn's anger, impatience, poor impulse control, and poor judgment while on steroids (AR 2212), Dr. Fourtounis' letter documenting Dr. Vaughn's irritability, aggressiveness, hypomania, and lack of judgment while on steroids (AR 2214), and Dr. Matsumura's chart record noting Dr. Vaughn became quite irritable, aggressive, and exhibited poor judgment on prednisone (AR 647).

Dr. Fletcher asserted a Shedler QPD Panel administered to Dr. Vaughn in December 2014 "presumably" would  have detected mood changes, as Dr. Vaughn claimed she suffered while on steroids.  AR 292.  She also asserted, erroneously, that Dr. Vaughn had started steroids

---

[9] Dr. Fletcher listed Dr. Vaughn's 2017 email-reported flares, but omitted the **three** flares noted in emails of 8/5/17, 8/31/17, and 10/4/17 (AR 289, 2566-68), resulting in a downward skew in her estimate of the number of times Dr. Vaughn might be absent from work due to flares.

on December 1, 2014.  *Id.*  Dr. Fletcher stated the Shedler QPD "screens for depression, manic

episode, anxiety, panic disorder, PTSD, bulimia, alcoholic/substance abuse, and somatization."

*Id*.  The Shedler QPD Panel is not a neuropsychological test.  It does not screen for cognitive

deficits and it would not have identified Dr. Vaughn's cognitive problems while taking steroids.

*Id.*  Dr. Vaughn also **was not on steroids** on December 3, 2014, as she stated in her December 1,

2014 email.  AR 2539.  She had been off prednisone for almost 2 months.  *Id.*

Dr. Fletcher asserted Dr. Vaughn contradicted her "reported cognitive and physical

impairments" in a February 4, 2013 email by requesting time off work, "as her mind is not firing

on all cylinders due to being on steroids, AND she wants to do some organizing at home."  AR

293.  In addition to focusing on a single note more than four years earlier than the relevant

termination date, Dr. Fletcher ignored the difference between using one's cognitive abilities to

make potentially life-altering medical decisions, or to engage in a mundane task such as

organizing personal items.

Dr. Fletcher incorrectly asserted Dr. Vaughn missed 11 days of work in 2013 because of

illnesses and the adverse effects of steroids.  *Id*.  Dr. Matsumura's January 18, 2013, chart record

notes Dr. Vaughn had 12 **absences** (not days) in 2012 (not 2013).  AR 420-21.  In addition, each

absence due to an asthma flare entailed more than a single day of missed work.  AR 2212-18.

Dr. Fletcher's failure to engage in a careful review led her to opine that Dr. Vaughn would

require no more than 12 days/year off for illness.  AR 292.  Hartford, the ERISA fiduciary, never

questioned her patently erroneous assertion.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

Dr. Fletcher stated she agreed with Dr. Krenek's opinion (July 2017) Dr. Vaughn had no

limitations and restrictions due to contractures (AR 3120-21) and Dr. Treat's opinion (August

2017) regarding Dr. Vaughn's functionality (AR 3130-31).  AR 295.

However, Dr. Fletcher omitted noting Dr. Vaughn only saw Dr. Krenek one time (surgery

consult for contractures; not for functional limitations/restrictions AR 3293-97) and omitted

substantial evidence that showed significant hand impairment:  (1) Occupational Therapist

("OT") Nancy Brown's July 13, 2016 report stating Dr. Vaughn's decreased range of motion due

to contractures impaired her ability "to carry, move, and handle objects" and reduced her hand

function to 52% of normal.  AR 1285-86. OT Brown had identified 40-59% impairment in the

hand. AR 1286; (2) OT Nancy Davenport's November 2, 2017 report noting Dr. Vaughn's

bilateral contractures that had not improved with injections; her current difficulty opening a jar,

writing, and typing; her increased pain with use; and her numbness and tingling.  AR 1509-13.

OT Davenport noted surgery was not an option due to Dr. Vaughn's elevated HbA1c, that there

is "not much therapy can do to help", and that Dr. Vaughn's limitations in range of motion

required her to modify her activities.  *Id.*  Dr. Fletcher also failed to note Dr. Treat's February 12,

2018 letter explaining that his response to Hartford regarding Dr. Vaughn's ability to function

only applied to Dr. Vaughn when she "was not experiencing a flare and was not on steroids" AR

2212.

### 3.  Hartford's Dr. Gause disregarded the record to reach his irrational conclusion Dr. Vaughn was not disabled from her occupation.

Orthopedist Dr. Gause asserted based upon Hartford's surveillance that Dr. Vaughn could

perform "frequent keyboarding, fine manipulation, simple and firm grasping" for 40 hours/week

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

with no restrictions regarding her contractures, although limited absenteeism might be an issue due to Dr. Vaughn's asthma and diabetes.  AR 302-03.  His assertion was erroneous.

Dr. Gause ignored that OT Brown found in July 2016 Dr. Vaughn's decreased range of motion due to contractures impaired her ability "to carry, move, and handle objects", reduced her hand function to 52% of normal, and demonstrated 40 to 59% impairment.  AR 1285-86.  He omitted that a second OT (OT Davenport) stated in November 2017 that Dr. Vaughn had to modify activities due to range of motion limitations caused by her contractures.  AR 1510-1511. Dr. Gause also noted, but dismissed, Dr. Weissflog's November 2017 assessment (AR 1540) that Dr. Vaughn had "severe bilateral Dupuytren's disease" and significant trouble using her hands, and that the only realistic solution was surgery, but that the recurrence rate would be high with her comorbidities.  AR 301.  He ignored Dr. Weissflog's APS, which noted the contractures had retrogressed, now involving six fingers – whereas initially only two had been affected – and that her restrictions were permanent.  AR 1965-67.

Instead, Dr. Gause based his opinion on video surveillance.  However, the hand movements filmed in surveillance did not show the type of fine hand movements required of a family practice physician, such as using instruments (otoscope, ophthalmoscope, speculum, minor surgery instruments), conducting examinations (palpation, pelvic and rectal exams) or performing procedures (obtaining biopsies, suturing, drawing medications up in syringes, injecting joints/soft tissues).  AR 302-03. *See* p. 35, *infra*.

Based upon his arbitrary review, Dr. Gause unrealistically concluded Dr. Vaughn could work full-time without restrictions, with only limited absenteeism. AR 303.

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** - Page 35 of 39

In *Petrusich*, this Court concluded that " inaccurate statements" made by the insurer's reviewing physicians "support the conclusion" that the insurer "conducted a superficial and cursory review rather than performing an adequate investigation of [the] claim as required by law." 984 F. Supp. 2d at 1121. Harford knew all three opinions were inconsistent with the record. Hartford accepted the reviews at face value and in its appeal denial letter and addressed none of the omissions, discrepancies or misperceptions. AR 137-147. Hartford also repeatedly asserted in its final denial letter (AR 137-147) that it had received "independent" opinions from consulting physicians, but omitted that its consultants conferred among themselves prior to submitting their Reviews on March 14, 2018. AR 278-79, 303. Hartford's unquestioning reliance upon these flagrantly erroneous file reviews was arbitrary.

### E.  Hartford Terminated Benefits After Four Years Without A Showing Dr. Vaughn's Condition Had Improved, And Her Condition Had Declined.

This Court noted "when determining whether Defendants abused their discretion in terminating Plaintiff's benefits, the Court necessarily will consider the record as a whole including whether Plaintiff's condition improved or substantially changed between the time Defendants initially deemed her eligible for benefits and the time Defendants reversed their decision". *Torres v. Reliance Std. Life Ins. Co.,* 2010 U.S. Dist. LEXIS 3470, at **21-22 (D. Or. Jan.15, 2010)*. See Hertz v. **Hartford** Life and Acc. Ins. Co.*, 991 F.Supp. 2d 1121, 1141 (D. Nev. 2014) ("There is simply no indication as to why [plaintiff's] treating physicians diagnoses and functionality assessments were sufficient to grant her LTD benefits for a time, but were no longer acceptable once her case had been referred to SIU")..

Dr. Vaughn's condition has not improved.  It has changed substantially since Hartford approved her claim, but for the worse, with the onset of dumping and further loss of hand function.  The fact Hartford terminated Dr. Vaughn's claim despite the fact her condition had not improved, but rather declined, is further evidence Hartford erred and abused its discretion.

### F.  Hartford And Its Consultants Arbitrarily Pointed To Surveillance As Supporting Claim Termination.

Hartford conducted surveillance during four days in March and April 2017, but never explained how the gross hand movements filmed during surveillance translated to the fine hand movements required in the practice of primary care.  AR 137-147.  *See* e.g., *Beaty v. Prudential Ins. Co. of Am.,* 2009 U.S. App. LEXIS 3106 *7 (9th Cir. 2009) (Beaty was seen sitting, walking, lifting, and carrying objects on a surveillance video, but the district court "erred by failing to consider how these activities demonstrate that she can perform the duties of her occupation as a vice president of underwriting").

In *Hertz,* the Court concluded Hartford's surveillance showed function "entirely consistent with Hertz's own self-reported limitations" and contrary to Hartford's assertion it depicted "inconsistencies with respect to [Hertz's] current level of function."  991 F. Supp. 2d at 1137.  The Court in *Hertz* also found troubling the reliance of Hartford's consultant on the video "to assess Hertz's functionality instead of conducting an in-person evaluation."  *Id*. at 1138.  Hartford's surveillance of Dr. Vaughn did not reveal inconsistencies and corroborated the record as a whole regarding functionality, contrary to Hartford's and its consultants' arbitrary assertions.

/ /

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** - Page 37 of 39

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

### G.  Hartford Relied Upon File Reviews That Arbitrarily Imposed An Objective Standard Of Proof Of Disability.

Hartford relied upon Drs. Shvarts' and Fletcher's file reviews, even though both consultants asserted Dr. Vaughn's proof of disability lacked objective evidence. Dr. Vaughn's coverage does not required that disability be established through objective evidence. Vaughn Affid. Ex. A, AR 3169-70.  An insurer errs and abuses its discretion by imposing an objective standard.  *See Laurie v. United of Omaha Life Ins. Co.*, 2017 U.S. Dist. LEXIS 35430 *57  (D. Or. Jan. 23, 2017) ("United also abused its discretion to the extent it relied on an objective evidence requirement to deny Laurie's claims because its STD and LTD Plans do not include such a requirement." Id. at *57).

### H.  Harford Ignored The Favorable Social Security Decision.

Hartford directed Ms. Vaughn to apply for SSDI (AR 251) and accepted a $2,500 reduction in its monthly liability effective September 2013, after approval of her SSDI claim (AR 3340), but used boilerplate language in its appeal denial that failed to address why Hartford had rejected the ALJ's favorable decision.  AR 145.  Hartford's failure to address the discrepancy is further evidence of its arbitrary decision-making.  *See Hertz,* 991 F.Supp. 2d at 1125-26, 1131 (Hartford requested plaintiff Hertz apply for SSDI benefits and accepted the offset, but its final denial "letter is largely devoid of any specifics as to how or why it reached a different conclusion regarding Hertz's disability status." *Id*. at 1131).

/ /

/ /

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** - Page 38 of 39

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

## VI. CONCLUSION

For all of the above reasons, Hartford erred and abused its discretion by terminating Dr. Vaughn's disability claim. Accordingly, Plaintiff respectfully requests that this Court grant her Motion for Summary Judgment, ordering Hartford to reinstate and pay her claim and monthly benefit.

## VII.    CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains 10,996 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED this 15th day of February, 2019.

Respectfully submitted,

s/ Megan E. Glor
Megan E. Glor, OSB No. 930178
megan@meganglor.com
Megan E. Glor, Attorneys at Law, P.C.
707 NE Knott Street, Suite 101
Portland, OR  97212
Phone: (503) 223-7400
Fax: (503) 751-2071

Of Attorneys for Plaintiff