Megan E. Glor, OSB No. 930178
Email: megan@meganglor.com
John C. Shaw, OSB No. 065086
Email: john@meganglor.com
Megan E. Glor, Attorneys at Law, P.C.
707 NE Knott Street, Suite 101
Portland, OR 97212
Telephone: (503) 223-7400
Facsimile: (503) 751-2071

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **STEPHANIE S. VAUGHN,** | **Case No. 3:17-cv-1904-BR** |
| **Plaintiff,** | |
| **v.** | **PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| **HARTFORD LIFE AND ACCIDENT INSURANCE COMPANY,** | |
| **Defendant.** | |

## TABLE OF CONTENTS

Statement Pursuant to LR 7-1 (1)(A) .................................................................1

I.    Introduction ............................................................................................2

II.   Argument ................................................................................................1

      A.  The Applicable Standard of Review Is *De Novo* ........................2

            1.    Hartford repeatedly, erroneously asserted prior
                  to litigation and in discovery that it had produced
                  all plan documents and complained that Plaintiff's
                  requests were improper..................................................3

            2.    Hartford suppressed that it knew a policy existed......................7

            3.    Hartford has provided an incomplete policy and
                  omitted related documents............................................9

            4.    The appropriate remedy is to strike the policy ...........................9

            5.    Hartford also suppressed the
                  Applicable 2013 Certificate........................................11

            6.    The Applicable Standard of Review Is *De Novo*......................12

      B.  Hartford Erred And Abused Its Discretion in Terminating
          Dr. Vaughn's LTD Claim and Denying Her Appeal................................12

            1.    Hartford documented Dr. Vaughn's severe
                  limitations but nevertheless referred her claim to
                  its Special Investigation Unit based upon alleged
                  inconsistency ...............................................................14

            2.    Contrary to Hartford's argument, Dr. Vaughn's
                  longitudinal medical record is highly relevant ..........................14

            3.    Dr. Vaughn's activities during surveillance are
                  consistent with her disability ....................................15

                  a.    The video clips do not show "extensive" activity ............15

                  b.    Dr. Vaughn's activities were consistent with
                        the stage of her asthma flare ...............................16

                        i.    Surveillance of March 28 ......................................18

i

ii. Surveillance of April 21 ........................................... 19

c. Dr. Vaughn's ability to use garden tools does not establish she has the fine motor dexterity required to practice medicine ................................. 19

d. Hartford's interview confirmed Dr. Vaughn remained disabled ............................................... 20

4. Hartford abused its discretion by relying upon consultant Dr. Rea's file review in terminating Dr. Vaughn's claim..................................................... 22

5. Hartford relied upon three false and misleading file reviews in denying Dr. Vaughn's appeal ............................. 23

a. Dr. Vaughn's condition worsened in 2017 ........................ 24

b. Hartford's appeal consultants did not review Dr. Vaughn's appeal ............................................. 25

c. Each consultant addressed a single condition................... 26

d. Hartford's consultants reached arbitrary conclusions ....... 26

6. Hartford continues to misrepresent and ignore the nature and impact of Dr. Vaughn's chronic, progressive comorbid diseases ................................... 28

7. Hartford misrepresents the 2017 medical record....................... 29

a. Hartford erroneously asserts lack of treatment in 2017 supported its termination ..................................... 29

b. Dr. Treat Fully Supported Plaintiff's Disability ............... 33

8. Hartford misleadingly asserts that Dr. Vaughn did not see an endocrinologist for her diabetes and that she self-treated asthma flares....................................... 34

9. Hartford did not analyze Dr. Vaughn's capacity to perform her own occupation as a primary care physician ................................................................... 35

III. Conclusion ................................................................. 36

Certificate of Compliance................................................. 38

# TABLE OF AUTHORITIES

**Cases**

*Coleman v. Hartford Life Ins. Co.*, 432 F. Supp. 2d 1030 (C.D. Cal. 2006)........................................ 10

*Curtis v. Hartford Life & Acc. Ins. Co.*, 64 F. Supp. 3d 1198 (N.D. Ill. 2014).................................... 26

*Gallegos v. Prudential Ins. Co. of Am.*, 2017 U.S. Dist. LEXIS 86123
(N.D. Cal. June 5, 2017)....................................................................................................... 26

*Kreeger v. Life Ins. Co. of N. Am.*, 766 F. Supp. 2d 991 (C.D. Cal. 2011) ............................ 25

*Madison v. Greater Georgia Life Ins. Co.*, 225 F.Supp.3d 1381 (N.D.Ga. 2016) ............................ 25

*Petrusich v. Unum Life Ins. Co. of Amer.*, 984 F. Supp. 2d 1112 (D. Or. 2013)........................... 10, 36

*Reetz v. Hartford Life & Acc. Ins. Co.*, 294 F. Supp. 3d 1068 (W.D. Wash. 2018)........................... 24

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011) ............................. 23, 24

*Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154 (9th Cir. 2001).................................................. 3


**Other Authorities**

29 C.F.R. § 2560. 503-1(h)(2)(iii)....................................................................................... 36

29 C.F.R. § 2560.503-1(g)(1)(iii)........................................................................................ 36

29 C.F.R. § 2560.503-1(h)(2)(iv) ....................................................................................... 37

USDC Oregon Local Rule 7-2 (b)........................................................................................ 38

## I.    INTRODUCTION

Hartford terminated Dr. Vaughn's claim effective November 2017, knowing she suffered

disabling chronic illnesses — asthma flares with additional debilitating mood dysfunction from

prednisone, type 1 diabetes that was rendered uncontrollable by her asthma steroid medications,

and bilateral Dupuytren contractures.  Hartford knew Dr. Vaughn had developed additional

illnesses since its 2013 claim approval: dumping syndrome, a known consequence of bariatric

surgery (2015), and a diabetic peripheral neuropathy.  Hartford also knew there had been

progression of her contractures, increasing her level of hand impairment.

Hartford arbitrarily and erroneously terminated Dr. Vaughn's claim, which was supported

by the opinions of her treating internists, Drs. Matsumura (2014) and Fourtounis (2014-18),

treating orthopedic hand specialist, Dr. Weissflog (2017), and treating immunologist, Dr. Treat

(2018), as acknowledged by Hartford.

Hartford set up termination through its Special Investigation Unit ("SIU").  Hartford

obtained surveillance video clips and interviewed Dr. Vaughn.  Hartford misrepresented the

surveillance results and falsely claimed Dr. Vaughn's activity on surveillance exceeded the

limitations and restrictions stated by her treating physicians.  Hartford then commissioned file

reviews, which proved to be flawed, and erroneously relied upon them for termination. Hartford

terminated Dr. Vaughn's claim despite Dr. Fourtounis' limitations, adopted by consultant Dr.

Rea, establishing Dr. Vaughn's disability from her own occupation.

In denying Dr. Vaughn's appeal, Hartford arbitrarily relied upon three additional file

reviews.  However, Hartford failed to provide these consultants with a substantial portion of the

medical evidence included in Dr. Vaughn's appeal.  The consultants misstated her medical

record, minimized the extent of her symptoms, failed to consider the impact of her comorbid conditions on her ability to practice medicine, and arbitrarily imposed an objective evidence standard on her claim.

Plaintiff's Motion establishes the applicable standard of review is *de novo* according to the 2013 Certificate of Insurance (the "2013 Certificate"), which applies, and which Hartford withheld and refused to add to the record.  Hartford fails to refute Plaintiff's argument and offers no explanation for its failure to maintain the applicable 2013 Certificate.  Hartford continues to claim the 2011 Certificate applies in the hope of obtaining "abuse of discretion" review.

Hartford attempts to bolster its argument with an unsigned, incomplete policy and trust agreement, produced for the first time weeks after Plaintiff filed her Motion for Summary Judgement.  The policy and trust agreement should be stricken based upon undue prejudice; Hartford's failure to establish they apply to Dr. Vaughn's claim; Hartford's false and misleading statements regarding plan documents; and as the appropriate remedy for Hartford's failure to maintain applicable plan documents.

Whether reviewed *de novo* or under the "abuse of discretion" standard of review, Dr. Vaughn is entitled to reinstatement of her disability claim.  She asks this Court strike the policy and trust agreement, grant her Motion for Summary Judgment, and deny Hartford's Cross-Motion for Summary Judgment.  In light of Hartford's egregious conduct, Plaintiff also asks this Court to declare her entitlement to continuing benefits.

## II.    ARGUMENT

### A.  The Applicable Standard of Review Is *De Novo*.

Plaintiff's Motion establishes the applicable standard of review is *de novo* based upon the applicable 2013 Certificate and based upon ambiguity in the 2011 Certificate Hartford produced.

Plaintiff's Motion For Summary Judgment (Doc. #49) ("Pl. Mot."), pp. 22-24.[1]  Hartford

erroneously addresses only the 2011 Certificate (Def. Cross-Motion for Summary Judgment and

Memorandum in Opposition to Plaintiff's Mot. (Doc. #53) ("Def. Resp."), pp. 13-15, ¶¶ 22-25)

and asserts without authority that "the present claim was adjudicated pursuant to the terms of the

LTD Certificate and the terms of that document should govern this dispute."  *Id.*, pp. 15-16.

Hartford does not refute Plaintiff's argument that *Grosz- Salomon v. Paul Revere Life Ins. Co.*,

237 F.3d 1154, 1160-61 (9th Cir. 2001), controls.  Pl. Mot., p. 22.

Hartford also argues a policy and trust agreement it produced for the first time weeks

after Plaintiff filed her dispositive motion controls.  Def. Resp., pp. 16-17.  Hartford makes this

argument after repeatedly asserting prior to litigation, in discovery, and in response to discovery

motions that  it had produced all applicable plan documents.  Pl. Mot., pp. 21-22.  Hartford has

failed to establish the incomplete, unsigned policy and trust agreement control and Plaintiff has

been unreasonably prejudiced by Hartford's belated production.  Accordingly, they should be

stricken.  Regardless of which plan documents are considered, however, the applicable standard

of review is *de novo*.

> **1.    Hartford repeatedly, erroneously asserted prior to litigation and in discovery that it had produced all plan documents and complained that Plaintiff's requests were improper.**

Hartford was required to respond to Plaintiff's discovery requests by producing all

discoverable documents and informing Plaintiff when it had reason to know documents existed,

but were missing.  In response to Plaintiff's counsel's December 2017 letter requesting "a

complete copy of the Long Term Disability plan that was in effect as of the date Dr. Vaughn

---

[1] Citations to the dispositive motions are to the page numbers the parties provided, not to the Court's blue stamped headers.

**Plaintiff's Response In Opposition To Defendant's Cross-Motion For Summary Judgment - Page 3 of 38**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

applied for benefits...and...all [subsequent] amendments and addenda..." (AR 3092), Hartford produced only the 2011 Certificate of Insurance.  Hartford did not produce the policy or trust agreement or 2013 Certificate, which applied to Plaintiff's claim.  *See* Pl. Mot., pp. 21-22.

Plaintiff's counsel called Hartford's incomplete response to its attention by letter dated January 8, 2018, stating the claim file Hartford had produced "only contained...the Long Term Disability ("LTD") Certificate of Insurance and did not contain [a] copy of the LTD policy, which controls if there is any difference between the Certificate of Insurance and the policy." AR 3087.  Plaintiff's counsel requested "the LTD policy and the Plan that were in effect on October 19, 2017—the date Hartford terminated Dr. Vaughn's LTD benefits." *Id*.  Hartford's representative noted after reviewing the request "the certificate of insurance that he rcvd is the actual policy/plan that we adjudicate ee's ltd claim based on" and "[w]e have not addt plan/policy aside from what we provided to atty."  AR 19.  She advised Plaintiff's counsel in a telephone message, "**no additional plan policy to provide aside from the one he was provided with**." *Id*.  (emphasis added).  Plaintiff's counsel made these requests after Hartford terminated Plaintiff's claim (AR 4019), in preparation for her February 2018 appeal.  AR 323.

Hartford also failed to provide the policy or trust agreement in response to three sets of discovery requests. Plaintiff's First Request for Production ("Pl. 1st RFP") sought all "long-term disability policies" and all "long-term disability certificates of insurance" dated January 1, 2011 to January 1, 2018.  Pl. 1st RFP (Doc. #32-3), pp. 12-13, ¶¶ 17, 18.  Hartford objected, asserting the requests were "**harassing**, unduly **burdensome**, **oppressive**, **overly broad** and **not proportional to the needs** of this case" and seeking "information...**not discoverable** in this ERISA action…"  Def. 1st Resp. (Doc. #32-4), p. 15, ¶¶ 17, 18  (emphasis added).  Hartford also

asserted that notwithstanding its objections, "**all responsive policy documents are contained in the administrative record that has been produced.**" *Id.* (emphasis added).

Plaintiff's Second Request for Production ("Pl. 2nd RFP") sought "the policy in effect on March 4, 2013, including any underlying group insurance agreement(s) between Hartford and its Trustee and/or Northwest Permanente," and "any other underlying insurance agreements, certificates, summary plan descriptions, claim fiduciary appointment forms, restatements, amendments, or riders applicable to the policy, **as of March 4, 2013, and continuing up to the present**." Pl. 2nd RFP (Doc. #32-7), p. 4, ¶ 1 (emphasis added). Again, Hartford asserted, "**all responsive documents** are contained in policy files that **ha[ve] already been produced for the relevant time period to the plaintiff's claim**." Def. 2nd Resp. (Doc. #32-8) p. 3, ¶ 1 (emphasis added).

Plaintiff also served Interrogatories seeking information about the policy/plan, expressly referenced in the (inapplicable) 2011Certificate Hartford had produced. Plaintiff asked the "date [the policy] was...initially issued by Hartford," the renewal period and renewal dates, and whether the policy had been amended or restated, with relevant dates. Pl. 2nd RFP (Doc. #32-7), p. 9, ¶¶ 1-4. Again, Hartford objected, asserting the Interrogatories were "beyond the scope of limited discovery in a case governed by the arbitrary and capricious standard of review," "**not relevant**..." "not proportional to the needs of the case," "**harassing, unduly burdensome, oppressive, overly broad**" and seeking "information not discoverable in this ERISA action." Def. 2nd Resp. (Doc. #32-8), pp. 8-12, ¶¶ 1-5 (emphasis added). Again, Hartford asserted that "**all responsive documents contained in the policy files have been produced** and information responsive to this Interrogatory...would be derived from the policy files produced." *Id.* (emphasis added).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR 97212
(503) 223-7400

When Plaintiff filed Motions to reopen discovery and compel production, in December 2018 (Doc. #31 and Doc. #37), Hartford continued to assert it had produced the only applicable plan document, the **2011** Certificate, which it erroneously referred to as the "operative" Certificate of Insurance."  Memo. Opp. Reopen Disc. (Doc. # 39), p. 5; Memo. Opp. 2nd Mot. Comp. Prod. (Doc. #41), p. 5.  In opposing Plaintiff's Motion to Compel (Doc. #37), Hartford asserted:

> Plaintiff already has a copy of the [2011] Certificate of Insurance that governs the present dispute and has had the document since prior to the filing of the suit.  The Certificate of Insurance was issued to NWP prior to the effective date of the Oregon administrative ban.

Memo. Opp. 2nd Mot. Comp. Prod. (Doc. #41),  p. 5.

Repeatedly, Hartford erroneously represented it had produced all plan documents, the record was complete, and the 2011 Certificate applied to Plaintiff's claim.  *See* Memo. Opp. Comp. Prod. (Doc. #25), pp. 5, 13; Memo. Opp. Reopen Disc. (Doc #39), pp. 4-5; Buhite Decl. Re: Def. Memo. Opp. Pl. Mot. Reopen Disc. (Doc. #40), p. 2, ¶ 3; Memo. Opp. 2nd Mot. Comp. Prod. (Doc. #41), pp. 3, 5.  Hartford also repeatedly characterized Plaintiff's requests for the policy/plan documents and *applicable* Certificate as improper.  Def. 1st Resp. (Doc. #32-4), p. 15, ¶¶ 17, 18; Def. 2nd Resp. (Doc. #32-8), p. 3, ¶ 1, p. 12, ¶ 4; Memo. Opp. Reopen Disc. (Doc. #39), p. 5.

Hartford had concluded it would have the advantage of the "abuse of discretion" standard of review under the 2011 Certificate, as it asserted in its Opposition To Plaintiff's Motion to Reopen Discovery:[2]

> **The Certificate of Insurance produced to Plaintiff during the claims process and after suit was filed sets forth that Hartford has "full discretion and**

---

[2] Plaintiff has shown Hartford's analysis is erroneous.  *See* Pl. Mot., pp. 23-24.

**authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The policy**.”  *See* Declaration of Russell Buhite, Ex. 1, Vaughn policy 000024.  *Id.* at Vaughn policy 000007.

Memo. Opp. Reopen Disc. (Doc #39), pp. 4-5 (emphasis added).  Hartford's objections and assertions were specious. Hartford had failed to produce either the policy or the applicable 2013 Certificate and repeatedly, erroneously, asserted the 2011 Certificate controlled.

### 2. Hartford suppressed that it knew a policy existed.

Two and a half weeks after Plaintiff's Motion for Summary Judgment was filed, Hartford produced a policy and trust documents for the first time and filed them with its Cross-Motion and Response.  Decl. R. Buhite (Doc. #54), pp. 2-3, ¶¶ 5-6; Decl.  Pfeiffer (Doc. #54-1), pp. 2-3 and Ex. A (Doc. 54-1).  Hartford states the documents were only recently located.

After pointedly characterizing Plaintiff's requests as "harassing" and "burdensome" and asserting that the 2011 Certificate is the only applicable plan document, Hartford declares that **actually, Hartford and its counsel had been searching for the policy for months**:

> **Since the inception of this matter** [November 2017], **the undersigned and Hartford law department personnel have searched diligently for a copy of the master group policy issued to the Trust**.

Decl. R. Buhite (Doc. #54), p. 2, ¶ 4 (emphasis added).   Also for the first time, Hartford declares it had concluded in December 2018 that the policy was lost:  **"As of December, 2018, we were told that the policy had been lost and could not be located**." *Id.*  (emphasis added).

Hartford did not inform Plaintiff in its discovery responses that a search for the policy had been underway "[s]ince the inception of this matter."  Hartford instead asserted the 2011 Certificate controlled; the claim file was complete; and Dr. Vaughn's requests were improper. *See* pp. 4-7, *supra*.  Nor did Hartford amend its discovery responses to correct its misleading statements.

Hartford also suppressed from its responses to Plaintiff's discovery motions—**which were briefed the same month Hartford and its counsel** "**were told that the policy had been lost and could not be located"—**that it had been searching for a policy it believed existed for an entire year and had concluded that very month the policy was lost.  Hartford's conduct suggests that, had its search for a policy been unsuccessful, it would never have disclosed the policy was lost, attempting to bolster its argument for "abuse of discretion" review.  *See* p. 6, *supra* (quoting Memo. Opp. 2nd Mot. Comp. Prod. (Doc. #41), p. 3).

Hartford's assertions regarding how and when the policy came to light are unreasonably vague.  Hartford declares:

> On Friday, March 1, 2019, **while discussing the matter with a colleague who was representing Hartford on another matter involving Hawaii Permanente as the employer-sponsor of disability coverage**, we determined that the colleague **had recently received** a copy of the master group long-term disability policy... Immediately, I made contact with the Hartford law department to determine if they could confirm that this master group policy applied during the pendency of the Vaughn claim and as to whether it indeed was the applicable policy.  Upon confirming that it was the group policy and that it applied to the claim, we sought and obtained the Declaration of Patricia M. Pfeifer attached hereto as Exhibit "1" attesting to these facts and attaching copies of the master group policy and trust agreements.

Decl. R. Buhite (Doc. #54), p. 2, ¶ 5 (emphasis added).  The "colleague" is not identified and other details about the "matter" are also omitted, including how long it had been pending, whether it is in litigation, or how the colleague had come to receive the policy.  Hartford's Ms. Pfeiffer vaguely declares she was "asked to search for and provide true copies of Group LTD policy...with amendments" and did so.  Decl. Patricia Pfeiffer (Doc. #54-1)Decl. Pfeiffer (Doc. #54-1), p. 2, ¶ 3 (emphasis added).  Her statement reveals Hartford had the policy all along.

/ /

/ /

### 3. Hartford has provided an incomplete policy and omitted related documents.

The purported policy is unsigned. *See* Decl. Patricia Pfeiffer (Doc. #54-1), p. 6. The applicable 2013 Certificate states the policy number as GVL-16008, yet the policy Hartford has produced is numbered "GR-11710, et. al. Rev. 7-'97." *Compare* Aff. Vaughn Ex. A (Doc. #50-1), p. 6 *with* Decl. Pfeiffer (Doc. #54-1), p. 6.

The policy states it covers "certain persons" and that "Participants" pay the premiums (*Id.*, p. 6) and that a trust agreement exists for providing "group insurance for the benefit of employees of employers." *Id.*, p. 7. There is no evidence in the documents Hartford has belatedly produced that Northwest Permanente was or became such "employer" and, thus, ever became subject to the trust. None of the documents produced – the policy itself (*Id.*, pp. 6-12), the "Employers In The Healthcare Trust Agreement" (*Id.*, pp. 13-22), the "Master Trust Agreement" or its amendment (*Id.*, pp. 23-32) or the "Indemnity Agreement" (*Id.*, pp. 35-37) name Northwest Permanente, PC.

In response to Dr. Vaughn's request (Aff. Vaughn (Doc. #50), pp.1-2), Northwest Permanente explained it did not have a policy, but had (and produced) only the (2013) Certificate that Hartford suppressed. *See* Aff. of John C. Shaw (filed herewith), p. 2, ¶¶ 2-3. The facts suggest Northwest Permanente was never provided the policy or trust agreement to which Hartford claims it is a party.

### 4. The appropriate remedy is to strike the policy.

Hartford's belated production has unreasonably prejudiced Dr. Vaughn. She lost the opportunity to conduct discovery regarding the validity and completeness of the policy and trust documents, whether they were delivered to NW Permanente (which does not have a copy) and

whether the trust agreement covers NW Permanente employees, including Dr. Vaughn.  She lost

the opportunity to discover whether the policy was delivered in Rhode Island, as Hartford claims,

or in Oregon, which has banned discretionary policies in disability policies since 2003 pursuant

to its Insurance Code, ORS 742.005 ("Grounds for disapproval of policy forms").  *See, e.g.,*

*Petrusich v. Unum Life Ins. Co. of Amer.*, 984 F. Supp. 2d 1112, 1117 (D. Or. 2013).

This is not the first time Hartford has belatedly produced and unilaterally filed a

document that potentially alters the applicable standard of review.  In *Coleman v. Hartford Life*

*Ins. Co.*, 432 F. Supp. 2d 1030, 1033 (C.D. Cal. 2006), the Court struck a document proffered by

Hartford days **before** Plaintiff's dispositive motion deadline.  The Court noted the document

"**would introduce Plan language that expressly provides for the exercise of discretion by the**

**Plan Administrator in connection with short-term disability benefits**."  *Id.* (emphasis added).

Rejecting "Hartford's attempt to characterize its eleventh-hour supplemental

disclosure...as substantially justified and harmless…" (*Id.*), the Court explained:

> Plaintiff's counsel prepared its Opening Brief regarding the standard of review
> based on the Plan documents produced during discovery.  Late in the afternoon of
> February 8, 2006, defense counsel produced the "General Information Section" of
> the CNA[3] Integrated Disability Plan [citation omitted], which was incorporated by
> reference into all CNA Plans and expressly provides for the Plan Administrator's
> discretion regarding claims for benefits: "Benefits under the plans will be paid
> only if the Plan Administrator decides in its discretion that the applicant is entitled
> to them."

*Id.* at 1032-33 (record citations omitted).  The Court stated, "Defense counsel indicates that it

first learned of the existence of the General Information Section on February 6, 2006, and asked

Plaintiff to include the document in the Administrative Record Plaintiff was submitting in

connection with the instant Motion" and that "Plaintiff objects to the late production of this

---

[3] Hartford is CNA's successor-in-interest.  *Id.* at 1031.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

document and asks the Court to decline to consider it here." *Id.* Rejecting Hartford's argument

that it had made "disclosure of the General Information Section" "as soon as practicable" the

Court stated:

> Hartford...offers no explanation of how and why CNA suddenly made the
> document available to Hartford two months after the close of discovery and four
> days before Plaintiff's Opening Brief was due. This argument is not credible in
> light of the fact that Hartford holds itself out as CNA's successor-in-interest and
> representations that it administers the Plan at issue, while CNA continues to fund
> that same Plan.

*Id.* at 1033.[4]

 Rejecting Hartford's characterization of the Plaintiff's objection as "an attempt to avoid

review 'by suppressing true, correct, and properly disclosed evidence,'" the Court stated:

> Parties are entitled to rely on the accuracy and completeness of the discovery
> produced, and they are bound by a duty to supplement or correct disclosures when
> additional, material evidence is available.

*Id.* Based upon Hartford's failure to timely produce the policy and given its false and misleading

assertions and its omissions, Document #54 and #54-1 should be stricken.

### 5.  Hartford also suppressed the Applicable 2013 Certificate.

The 2011 Certificate, does not apply to Plaintiff's claim. *See* Pl. Mot., pp. 22-24. The

only *material* difference between the 2011 Certificate and the 2013 Certificate is the presence of

a discretionary clause in the 2011 Certificate. *Compare* Doc. #43-14, p. 24, p. 24 (2011) with

Aff. Vaughn, Ex. A (Doc. #50-1), p. 23 (2013).

Plaintiff has shown the clause does not satisfy the Ninth Circuit's strict clarity

requirement (Pl. Mot., pp. 23-24); however, Hartford knew it had a colorable argument for

"abuse of discretion" review under the 2011 Certificate, whereas it had no such argument under

---

[4] Likewise, Hartford continues to administer the NW Permanente plan. Decl. of Megan Glor
(filed herewith), ¶ 2.

**Plaintiff's Response In Opposition To Defendant's Cross-Motion
For Summary Judgment - Page 11 of 38**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

the 2013 Certificate. *See* Memo. Opp. 2nd Mot. Comp. Prod. (Doc. #41), p. 3 (Hartford,

asserting, "The [2011] Certificate of Insurance produced to Plaintiff during the claims process

and after suit was filed sets forth that Hartford has "full discretion and authority to determine

eligibility for benefits and to construe and interpret all terms and provisions of The policy.").

Hartford knew if it succeeded in keeping the 2013 Certificate out of the record, there would be a

chance this Court would conclude the "abuse of discretion" standard of review applied.

Hartford's failure to obtain and produce the 2013 Certificate and its actions in trying to keep it

out of the record were bad faith attempts to establish deferential review.

### 6.  The Applicable Standard of Review Is *De Novo.*

The policy does not contain a grant of discretion. Decl. Pfeiffer, Ex. A (Doc. #54-1), pp.

6-12. It states the Certificate is incorporated and made a part of the policy and that the terms of

the Certificate control coverage, eligibility and effective date of insurance, termination,

exclusions, and policy provisions pertaining to state and federal insurance requirements. *Id.,* p.

10. Thus, even if the Court considers the policy, the applicable standard of review is *de novo* in

accordance with the applicable 2013 Certificate, which does not contain a discretionary clause.

### B.  Hartford Erred And Abused Its Discretion in Terminating Dr. Vaughn's LTD Claim and Denying Her Appeal.

Dr. Vaughn remained chronically ill in late 2016 and 2017. She continued to experience

intermittent asthma flares requiring prednisone. AR 1320-21, 2225-26, 1569-72. Her type 1

diabetes remained uncontrolled because of steroid use. AR 1274, 1364, 1968-79. Her

contractures had slowly progressed. AR 1285-86, 1509-11, 1539-40. Following her 2015

bariatric surgery, she developed dumping syndrome, which was becoming more pronounced.

AR 2227, 1542-47, 1550.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

In mid-June 2016, Hartford's internal note acknowledged she remained chronically ill

and disabled.  AR 61-62.  Hartford noted:

> At this point, **there is no further impact from a risk mgmt standpoint that
> [can be] made on this claim**.  Extensive medical review shows [Dr. Vaughn] is
> prevented from performing the essential duties and physical demands of her own
> light occ.  She continues to experience active flares and continuous use of
> prednisone has caused her to become diabetic also.  [Vocational Rehabilitation]
> did not accept claim for intervention.

AR 61.  The highlighted text reveals Hartford evaluated how its liability might be lessened, and

concluded it could not be reduced.  Its vocational rehabilitation department's rejection of the

claim shows Hartford knew Dr. Vaughn would not return to work.  Hartford also noted:

> **Don't feel [Dr. Vaughn] is a good [lump sum settlement] candidate given
> frequency of flares and associated mortality risk if flare is severe enough.
> [Dr. Vaughn] will likely never RTW f/t [full time] f/d [full duty] since she is
> at max therapy and condition i[s] chronic**, so really only AR updates are
> needed going forward…

*Id*.  Hartford added:  "**Expect benefits to continue thru duration if EE survives thru that**

**date**."  AR 62. (emphasis added).

On January 20, 2017 Hartford noted that its Vocational Rehabilitation "did not accept

[Dr. Vaughn's] file given significance of limitations which disqualify her from physician related

jobs such as peer consultant, etc." AR 58.  Hartford also acknowledged the medical record

showed "severe persistent asthma" and  "uncontrolled" type 1 diabetes.  AR 57.

On January 27, 2017, examiner Michelle Carlson called Dr. Vaughn for an update.  AR

55.  Dr. Vaughn explained she had experienced four asthma flares since July 2016 and stated

there had been no change in her condition.  *Id*.  She stated the steroids made her "crazy."  *Id*.

Dr. Fourtounis confirmed her continuing disability in a March 2017 APS.  AR 3375-76.

He noted diagnoses of severe recurrent asthma, recurrent effects of corticosteroids and diabetes

**Plaintiff's Response In Opposition To Defendant's Cross-Motion
For Summary Judgment - Page 13 of 38**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

type 1. AR 3376. He indicated there were "Objective Physical Findings" from "4th quarter 2016 to now," i.e., "Severe steroid resistant flare 1/14/17 and 2/3/17." *Id*. He noted flares had to be "treat[ed]...aggressively at first sign of a cold." *Id*. He indicated she could not tolerate sitting, standing, walking during "frequent flares" and wrote, "<u>intermittently</u> ill -- during flares unable to care for self." AR 3375 (emphasis in original). These statements were consistent with the medical record.

>   **1. Hartford documented Dr. Vaughn's severe limitations but nevertheless referred her claim to its Special Investigation Unit based upon alleged inconsistencies.**

Despite Hartford's sobering admission and conclusion it would not offer Dr. Vaughn a settlement because of her elevated risk of premature death, Hartford began to set up claim termination. On March 20, 2017, Ms. Carlson summarized:

>   r an ls [restrictions and limitations] ap [attending physician] states-no sit stand walk during freq flares never to remainder o[f] r and ls ap [attending physician] states during her 1 to 3 wk flares. Ap states pt is intermittently ill and during flare ups unable to care for self.

AR 53. While not all the abbreviations are evident, her summary shows the medical record confirmed a continuing serious disability. Yet she noted, "ssd does not reconciles [sic]" and referred the claim to Hartford's "SIU" (Special Investigation Unit).

>   **2. Contrary to Hartford's argument, Dr. Vaughn's longitudinal medical record is *highly* relevant.**

Hartford criticizes Plaintiff for emphasizing Hartford's "claim approval from 2013-2017" and "asserting old claim comments from Hartford personnel from 2013-2017 as supporting Dr. Vaughn's ongoing disability." Def. Resp., p. 37. The longitudinal record is highly relevant. It documents Dr. Vaughn suffers severe conditions that are known to be chronic and progressive, including type 1 diabetes, which has resulted in a peripheral neuropathy, and contractures, which

now involve six fingers.  It documents she developed dumping syndrome after Hartford's claim

approval and that the frequency of episodes has increased.  AR 2212-18.  The record confirms

multiple providers concluded she will not recover and that Hartford's consultants agreed.  Pl.

Mot., p. 36.

### 3.  Dr. Vaughn's activities during surveillance are consistent with her disability.

Hartford commissioned four days of surveillance.  On March 27, 2017, Dr. Vaughn was

never observed.  AR 4049-50.  On March 28, she was filmed for approximately one hour.  AR

4050.  On April 21, she was filmed for 14.75 minutes (AR 4061) and on April 22, she was

filmed for .5 minutes.  AR 4064.  The surveillance video totaled approximately 1 hour and 17.5

minutes of activity.  AR 3948-49.  Hartford compiled short video clips, creating the impression

Dr. Vaughn was continually engaged in activities, whereas the brief periods of activity recorded

were actually broken up over time.

### a.  The video clips do not show "extensive" activity.

Hartford asserts the compiled clips show "extensive activity."  Def. Resp., p. 8.  Hartford

asserts Dr. Vaughn was seen "hiking from 9:30 a.m. to 11:30 a.m." and "participating in a 2-hour

hike."  *Id*., pp. 7, 8.  Hartford also claims she performed "vigorous physical activity with yard

tools for an extended period."  *Id*., p. 8.

The March 28 video shows Dr. Vaughn aerating her front yard with a mechanical tool,

tapping soil plugs into a bucket, and dumping the contents into a garbage can for one hour.  AR

4051-52.

On April 21, the total surveillance time was 14.75 minutes (including approximately 30

seconds that did not include Dr. Vaughn).  AR 4061.  The video shows her for 3 minutes and 50

seconds, at the beginning and end of a hike, and, hours later, using a weedwacker for approximately 1 minute and an electric lawn mower for 8-9 minutes.  AR 4061.  Contrary to Hartford's assertion, Dr. Vaughn was not observed hiking for two hours.  Hartford assumes she hiked the entire time she was gone from the parking lot; however, the video does not establish she hiked the entire time.

### b.  Dr. Vaughn's activities were consistent with the stage of her asthma flare.

Hartford asserts Dr. Vaughn engaged in the activities on April 21 while she was experiencing an asthma flare.  Def. Resp., p. 8.  Hartford's assertion ignores important details regarding her flares.

Dr. Fourtounis explained in February 2018 the flares are characterized by an acute phase, which may last a week or more, and a recovery phase lasting from two to eight weeks.  He stated:

> During the **acute phase** of an asthma flare, which may last a week or more, Dr. Vaughn's wheezing, dyspnea, and high doses of prednisone (60-80 mg. daily) essentially limit her to bedrest and minimal household activity.

AR 2214 (emphasis added).  He then described the recovery phase:

> **Once Dr. Vaughn begins to recover from the acute phase** of a flare, she starts to taper her prednisone, which may take anywhere from 2-3 weeks to 6-8 weeks depending upon the severity of the flare and the response of the flare to the prednisone.  **As Dr. Vaughn recovers from the acute phase of an asthma flare and her dyspnea decreases, she is able to become more active physically**, even though she may still be tapering the prednisone and still be experiencing the adverse prednisone effects.

AR 2214-15 (emphasis added).  Dr. Fourtounis added:

> **When not having a flare and not on prednisone, Dr. Vaughn's restrictions/limitations are as-tolerated on a day-to-day basis** depending on her lung capacity, debilitation from her most recent flare, daily diabetic status, daily dumping syndrome status, and hand contracture condition.

AR 2217 (emphasis added).

Similarly, Dr. Vaughn explained in her January 2018 statement: "Every day is and was different," adding, "[m]ost days I have symptoms of asthma on medications, most nights I wheeze...I check my peak flow every day and decide how to proceed."  AR 2222.  She described her condition on approximately 5 to 10 percent of the time:

> **Some days I take my baseline drugs of very powerful inhaled steroids and don't need much else** (peak flow in the 200 range, normal is 400+).  **This may be 5-10 percent of the time**.

*Id*.  She then described her condition on 40 percent of days, which she characterized as a "medium state of flare":

> **On most days, there is a more complicated regimen.**  If my peak flow is <200 I will start taking nebulizers of more powerful steroids and bronchodilators.  **On most of those days** I can still get up, take walks, do a chore or two, walk up the stairs one at a time with mild shortness of breath, and usually become very short with my family and friends.  My blood sugars become erratic and I am stuck with every 2 hours checking it and acting on it.  I have to urinate every hour.  **If one of these breathing treatments causes an expulsion of a mucous plug, I often will go outside to walk or work in the yard to keep my lungs expanded**.  But **some days**, those medications don't work well and I am stuck around the house.  **I am in this medium state of flare (which I call it) 40 percent of the time**.

*Id*.  (emphasis added).  She explained that she does not start prednisone unless her peak flow[5] is around the 150 range, indicating a more severe flare with increased airflow obstruction limiting her to bedrest and minimal household activity.  *Id*.  If her PEF remains above 200, she doesn't start prednisone and her activities are as tolerated.  *Id.,* AR 2214-15, 2217.

Dr. Vaughn explained that her medium flare state had evolved into "full blown flares" seven times in 2017, and explained what occurs when this happens:

---

[5] Peak Expiratory Flow Rate is a measure of airway obstruction. A normal measure for Dr. Vaughn would be approximately 420 L/min.  AR 2231.  Pl. Mot., p. 8, n. 3.

> My peak flows are in the 150 range, I am actively wheezing, my family is scared,
> I do the nebulizer often, like up to once an hour.  I start 80 mg of prednisone,
> along with all the baseline steroids and the nebulized steroids.  My blood sugar
> jumps into the 400s, 500s, or 600s.  I am actively trying to breathe.  I am having
> to urinate at least once an hour.  I know that I need to drink to compensate for all
> the urinating and wheezing so I am forcing fluids.  I am coughing.  I am not
> sleeping.  If my peak flow gets down in the 125 range I go to the ER or urgent
> care to get IV steroids and more breathing treatments…If I can maintain my peak
> flow in the 150 range I continue with this active intensive management for 2-5
> days.  I isolate myself, so as not to create family strife with my mean aggressive
> personality style on steroids.  After the first few days I am able to get up and get
> prepared foods to eat.  My blood sugars are erratic as the prednisone is changing
> daily.  I do not drive...I take very slow walks around the house and watch TV.

AR 2222.   She explained her condition as a full blown flare subsides:

> Unfortunately I cannot just stop the prednisone.  It has to be weaned.  So, after a
> few days as my peak flow gets closer to baseline, I slowly begin to wean down
> the steroids each day.  I am weak, my blood sugars are high and I am antsy and
> irritable from the side effects.  I have a little mania…, poor judgment, and
> inability to sleep...I can do some chores if my breath is not too short, like dishes,
> laundry, and taking out the garbage.  I can also take walks.  I do not drive or pay
> bills or make any big decisions during this time.  When the prednisone gets to
> about 10 mg a day I try to build myself up with walks, shopping, gardening,
> money management, etc., to try to get strong enough for the next flare.  Because
> this phase is so long with the weaning of steroids, I would say I am in this stage
> 40-50% of the time.

*Id.*

#### i.    Surveillance of March 28.

On March 12, 2017, Dr. Vaughn "awakened in extremis," but coughed up a 4-inch plug

following nebulizer treatment and did not need to start oral steroids.  AR 2225.  Her emails to her

providers do not document an acute flare phase on March 28.  AR 2557-68.  Thus, while she

might have experienced mild flare symptoms on March 28, she was not in the acute phase of a

flare that required bedrest, minimal household activity, and 80 mg of prednisone/day.  Thus, her

physical activities, aerating her yard for an hour, were "as tolerated."

/ /

**Plaintiff's Response In Opposition To Defendant's Cross-Motion
For Summary Judgment - Page 18 of 38**

### ii.    Surveillance of April 21.

Dr. Vaughn noted in her 2017 list of Asthma/Cellulitis Events that she had a small flare on April 8 that might have represented an incomplete resolution of her February flare.  AR 2225. She was on bedrest and nebulizers for 3 days and started a steroid small dose pack.  *Id*.  She had a PEF of 175 initially and had high blood glucose values requiring "stat dosing for one week." *Id*.  On April 8, she informed Dr. Fourtounis that she was experiencing a flare, but was doing "fine now on the prednisone and nebulizers".  AR 1401.

Her 2017 list of Asthma/Cellulitis Events documents she had wheezing between 2 and 4 am on April 21 and passed a large plug around 7:30 am following steroid nebulizer treatment. AR 2225.  She did **not** need to start oral steroids, as her minimum PEF was 250.  *Id*.  She used her steroid nebulizer several times during the day.  *Id*.  In her April 21 email to Dr. Fourtounis, she stated she thought her "current flare was controlled but this spring bloom is seeming to cause a relapse".  AR 2564.

Dr. Vaughn's activities on April 21 were as outlined by Dr. Fourtounis.  She was able to tolerate a morning walk and, two and a half hours later, less than ten minutes of yard work, consistent with her physical limitations in between flares or during the recovery phase of a flare while on prednisone.   AR 2214-15.

Contrary to Hartford's assertions (Def. Resp.,  pp. 28, 30), the surveillance corroborated Dr. Vaughn's limitations during the time she was not in the acute phase of a flare.

### c.  Dr. Vaughn's ability to use garden tools does not establish she has the fine motor dexterity required to practice medicine.

The videos showing Dr. Vaughn's gross hand movements as she aerated her yard for an hour on March 28 and used a weedwacker for one minute and a lawn mower for 8-9 minutes on

April 21, do not demonstrate she had the capacity to perform the fine hand movements required

of a family practice physician, e.g., to conduct physical examinations; use medical instruments;

suture wounds; administer injections; or perform biopsies.  AR 3922.  Hartford misstates the

evidence and fails to reconcile its assertions regarding Dr. Vaughn's hand function with her

occupational duties or OT Brown's July 2016 clinical assessment of 52% hand function and 40-

59% range of hand impairment.  AR 1286.

### d.  Hartford's interview confirmed Dr. Vaughn remained disabled.

When Hartford's Carrie Still interviewed Dr. Vaughn on May 12, 2017, Dr. Vaughn

explained she has "bi-quarterly or quarterly flares of asthma which can only be treated by

prednisone, usually a couple-week-intervals of prednisone" and that "**when I'm on prednisone**,

my blood sugars go into the high hundreds, like 900...And my mental health status is affected."

AR 3192 (emphasis added).

She explained she is substantially limited in her activities during asthma flares, whereas

she has little limitation otherwise. For example:

> Q: Okay.  All right.  **Let's talk a little bit about your restrictions and limitations.
> What is the maximum amount of time that you can walk?**
> A: **A flare day or a non-flare day?**
> Q: How about both?
> A: **On a flare day, 5 minutes.**
> Q: On a non?
> A: **A non-flare day, hours.**
> Q: Okay.  And do you feel like you can walk enough to take care of you daily activities,
> such as running errands and such?
> A: On a non-flare day, but not on a flare-day.  I have people...I have two more people
> here and they take care of me on flare...during flares.

AR 3192-3193 (emphasis added).

> Q: Okay.  **And what's the maximum amount of weight you can lift and carry?**
> A: WELL, right now, my back is out, but **30 pounds not in flare.**
> Q: **Not in flare? Okay.**

**Plaintiff's Response In Opposition To Defendant's Cross-Motion
For Summary Judgment - Page 20 of 38**

> A: **I mean, flare I'm laying down.**
> Q: Okay.
> A: I don't move.
> Q: Okay.
> A: People bring me food.
> Q: All right.  So when you do have a flare, you pretty much just at rest, CHECK OUT?
> A: Yes.

AR 3194 (emphasis added).  Dr. Vaughn's response, "**I mean, flare I'm laying down,**" reflects that she distinguishes between the acute and recovery stages.

Dr. Vaughn told Ms. Still she usually experiences more flares in Spring and Winter than in Summer or Fall.  She explained she had had "a horrible spring" and "since March, **basically**, I've been in a flare."  AR 3199 (emphasis added).

Knowing Hartford had conducted surveillance during this period, Ms. Still asked:  "So since you've been having a flare since March, have you pretty much been bedridden and down and out?"  *Id*.  Dr. Vaughn, who did *not* know about the surveillance, accurately responded, "**Well, no, like today I'm good… am on steroids, but I'm toward the tail end of the steroids.**"  *Id*.  (emphasis added).  Her statements are consistent with the surveillance.  Dr. Vaughn also described her hand limitations:

> Q:  And you can use all your fingers?
> A:  No.
> Q:  No?  Which fingers can't you use?
> A:  **These two are messed up.**
> Q:  **Yes, ma'am, they are.**  So let me be sure, the right...
> A:  That one is messed up too.
> Q:  What did you do?
> A:  It's from diabetes.  It's called DeQuervain's ti-...tenosynovitis.  It makes it impossible to type.
> Q:  **I could see there that would be a problem.**
> A:  Yeah, I can't straighten them out.
>                                     …
> Q:  Okay, **I might know the answer to this question.  Do you have enough strength in your hands to open jars.**
> A:  **Not really.**

...

Q:  Okay.  **Can you type?**
A:  **No, I can't type.**
Q:  No?  Okay.  Do you know how to type?
A:  Yes.

AR 3195-3196 (emphasis added).  The hand problems were obvious even to a casual observer.

Hartford argues Dr. Vaughn's blood sugar levels during her December 7-8, 2017, hospital admission were "in the 325-425 range and not the 900 levels claimed by Plaintiff during the claim interview on May 12, 2017."  Def. Resp., p. 12.  Hartford's own consultant, Dr. Fletcher, noted that most blood glucose meters only accurately measure up to 600 and that "any result above that should be considered inaccurate".  AR 291.  It is possible Dr. Vaughn's blood glucose meter provided an inaccurate blood glucose reading of 900, or she misspoke, consistent with being on prednisone during the interview.  AR 3191; AR 2221-22.  Her Daily Logs document high blood glucose values of 400 to 600 (AR 1968, 1970, 1972, 1979) and Dr. Fourtounis documented levels of 600-700 on steroids.  AR 2215.  Hartford's assertion is specious in the context of the record as a whole.

Regarding Dr. Vaughn's credibility, no **treating** provider has ever suggested Dr. Vaughn exaggerated her reports and a Social Security Administration judge found "no inconsistencies that would bring [her] credibility into serious question" (AR 3324) and found her "testimony and statements" to be "consistent and in proportion to the diagnosed impairments."  AR 3322.  Hartford never had a doctor examine Dr. Vaughn.

### 4.  Hartford abused its discretion by relying upon consultant Dr. Rea's file review in terminating Dr. Vaughn's claim.

Plaintiff's Motion shows that Hartford consultant Dr. Rea agreed with Dr. Fourtounis' assessment of Plaintiff's functionality during asthma flares.  Pl. Mot., pp. 15,17.  Hartford cites

Dr. Rea's conclusions as supporting its claim termination, asserting that while he "agreed with primary care doctor Fourtounis, that during an asthma flare, Plaintiff would have to limit her activity," "Plaintiff herself had stated that the incidence of flares in 2017 was only 1-2 times per quarter." Def. Resp., p. 9 (citing AR 3136).

Hartford's argument ignores that the flares occurred unpredictably and affected Dr. Vaughn for many weeks, with great variability in her function. The record shows she was medically retired from work because of unacceptable absenteeism due to flares. AR 3933, 3935. Hartford also ignores that Dr. Rea did not address the impact of Dupuytren contractures or dumping syndrome, or the adverse effects of steroid medications on her work capacity. AR 3133-37. The Dupuytren contractures had left her with hand impairment of 40-59% and hand function of only 52%, as documented by OT Brown. AR 1286. Hartford cites Dr. Rea's inadequate report without addressing his glaring omissions and ignores his opinion that Dr. Vaughn would need to limit her activity during flares, in line with Dr. Fourtounis' recommendations.

### 5. Hartford relied upon three false and misleading file reviews in denying Dr. Vaughn's appeal.

Hartford had the option of having Dr. Vaughn examined (Aff. Vaughn, Ex. A (Doc. #50-1), pp. 14-15), but chose not to do so, despite its assertion there were discrepancies between the opinions of treating physicians Drs. Fourtounis and Treat (AR 2212-18), who confirmed disability, and Hartford's Drs. Shvarts, Fletcher, and Gause, who never examined Dr. Vaughn but asserted she could work full time (AR 284, 292, 303); Pl. Mot., p. 27. In *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011), the Court stated: "An insurance company may choose to avoid an independent medical examination because of the risk that the

physicians it employs may conclude that the claimant is entitled to benefits" and concluded,

"The skepticism we are required to apply because of the plan's conflict of interests requires us to

consider this possibility in this case." *Id*.  Like Plaintiff Salomaa's record, Dr. Vaughn's

"medical record by physicians who actually examined [her] is entirely one sided in favor of [her]

claim" and "[Hartford] rejected its opportunity to see if there was another side." *Id*.  Hartford

knew that given her severe impairments, an examining doctor could only find her disabled from

her occupation.

### a.  Dr. Vaughn's condition worsened in 2017.

Dr. Vaughn's severe asthma persisted in 2017 and she suffered a new symptom, a

peripheral neuropathy of her feet, resulting from uncontrolled diabetes.  AR 2217.  Her

contractures had progressed (AR 1509) such that by November 2017, she had contractures in six

fingers.  AR 2536.  She had developed dumping syndrome after her 2015 bariatric surgery,

which had worsened in the last five months of 2017.  AR 2227.

Hartford and its file review consultants ignored Dr. Vaughn's worsening condition in

asserting she could work full time.  AR 284, 292, 303, 137-47,  Pl. Mot., p. 36-37.  *See Reetz v.*

*Hartford Life & Acc. Ins. Co.*, 294 F. Supp. 3d 1068, 1079-80 (W.D. Wash. 2018) ("Hartford

awarded Ms. Reetz...benefits—for almost two years—on account of her fibromyalgia and back

pain...which strongly suggests that she was disabled.  Thus, the court expects to see evidence

of… improvement in the period of time leading up to April 2016, when Hartford… determined

Ms. Reetz was no longer disabled").

/ /

/ /

/ /

**Plaintiff's Response In Opposition To Defendant's Cross-Motion**
**For Summary Judgment - Page 24 of 38**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

**b. Hartford's appeal consultants did not review Dr. Vaughn's appeal.**

Hartford erroneously asserts that its consultants conducted a full review (Def. Resp., p. 10), and the consultants claimed to have reviewed all documents provided.  However, none of the documents on the physicians' lists of records they reviewed mention the appeal letter or any of its enclosures.  AR 278, 288, 297.  Nor do the reviews address the appeal or its enclosures.  AR 277-303.  Hartford's consultants did not address:

- Dr. Treat's February 2018 letter (AR 2212-13)

- Dr. Fourtounis' February 2018 letter (AR 2214-18)

- Dr. Gibson's December 2017 letter (AR 2219)

- Dr. Vaughn's January 2018 statement (AR 2220-24)

- Dr. Vaughn's November 2017 Logs (AR 1968-79)

- Dr. Vaughn's 2017 List of Asthma/Cellulitis Events (AR 2225-26)

- Dr. Vaughn's 2017 list of Gastric bypass issues (AR 2227).

These documents were substantial evidence of Dr. Vaughn's ongoing disability and worsening conditions.  Yet Hartford only provided its consultants medical records from Kaiser (1/14/13 through 12/27/17), which had been provided with the appeal.  Yet Hartford relied upon its consultants' opinions (AR 137-47), reducing the appeal process to a sham.  *See Kreeger v. Life Ins. Co. of N. Am.*, 766 F. Supp. 2d 991, 1000 (C.D. Cal. 2011) ("Another relevant factor to find abuse of discretion is whether [insurer] provided all relevant evidence to an independent expert reviewer." (citing *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009)); *See Madison v. Greater Georgia Life Ins. Co.*, 225 F.Supp.3d 1381, 1399 (N.D.Ga.

2016) (noting insurer "could have used one hundred reviewers, but if they all failed to consider all record evidence, they engaged in unreasoned decisionmaking …")

### c. Each consultant addressed a single condition.

Each consultant addressed one condition in isolation.  AR 137-47.  Dr. Shvarts addressed only asthma (AR 279), Dr. Fletcher addressed only diabetes (AR 287) and Dr. Gause addressed only Dupuytrens (AR 302).  None addressed the effects of Dr. Vaughn's combined illnesses on her ability to practice medicine.  AR 137-47.  That was erroneous and an abuse of discretion. *See Curtis v. Hartford Life & Acc. Ins. Co.*, 64 F. Supp. 3d 1198, 1214 (N.D. Ill. 2014) (in concluding Hartford's claim denial was an abuse of its discretion: "None of Hartford's medical experts considered the combined effect of Curtis's physical and cognitive impairments as of the determination date.")' *Gallegos v. Prudential Ins. Co. of Am.*, No. 2017 U.S. Dist. LEXIS 86123, *30 (N.D. Cal. June 5, 2017) (holding claim termination was an abuse of discretion, noting file review that was "only from a 'rheumatology perspective'" and that ignored co-morbid "non-rheumatological conditions such as her migraine headache, shoulder surgery, chronic sinusitis and endocrine issues should have been reviewed by other specialists").

### d. Hartford's consultants reached arbitrary conclusions.

The record is replete with evidence Dr. Vaughn suffers severe disability, including spirometry documenting severe obstructive lung disease and declining function since 2014 (AR 1614), low PEFs and elevated blood glucose levels (AR 1968-79, 2225-26), elevated HbA1c values and uncontrolled diabetes from steroid use (AR 1364, 1520), frequent asthma flares requiring prednisone, then tapering (AR 2225-26, 2562-68), progression of contractures (AR 1620-21) with decreased hand function (AR 1285-86), and increased dumping episodes (AR 2227).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

Plaintiff's Motion shows Drs. Shvarts, Fletcher, and Gause disregarded the medical record to irrationally conclude she could work full time (40 hours/week).  Pl. Mot., pp. 27-36.  It also shows they arbitrarily imposed an objective evidence standard (AR 279, 281, 292) and dismissed her subjective symptoms.  *Id*., p. 38.

The record also shows the consultants made arbitrarily low estimates of the number of days Dr. Vaughn would be absent due to illness.  Dr. Fourtounis explained that over the past five years, Dr. Vaughn had averaged "a severe asthma flare every 1-2 months that required prednisone and/or steroid nebulizer treatment for a minimum of 2-3 weeks to as long as 6-8 weeks."  AR 2214.  He added that once she began to recover from the "acute phase of a flare" that may last "a week or more," she tapered prednisone for "anywhere from 2-3 weeks to 6-8 weeks…"  AR 2214-5.

At a minimum, for each flare that required prednisone, she was precluded from working for approximately 3 weeks, by the acute flare phase or the adverse effects of prednisone during the tapering in the recovery phase.  *Id.*  She experienced eight asthma flares in 2017 that required prednisone.  AR 2212.  Thus, she would have been absent at least 24 weeks due to flares alone, without considering diabetic complications such as hypoglycemia, or dumping episodes. In asserting Dr. Vaughn could work full time (AR 284, 292, 302), the consultants ignored her history, including that she had been medically retired because she was unable to perform even a half-time position.  AR 3933-35.

They also made irrational predictions about how much time she would miss.  Dr. Shvarts stated she would, at most, "miss work 2-3 times per year for one to two days each time due to asthma flares."  AR 284.  Dr. Fletcher claimed she may "be required to be absent from work for 1-3 days at a time during a 40 hour week up to 4 times per year (up to 12 days off per year) for

acute illness related to her asthma, diabetes or severe mood changes that may occur while taking

prednisone." AR 293. Dr. Gause stated (after discussing with Drs. Shvarts and Fletcher) that

"absenteeism may be an issue with regards to her asthma and diabetes however, on a limited

basis." AR 303.

Their maximum predicted absence estimate is 12 days annually. That would not cover

the expected absence of 21 days for a single flare requiring prednisone, and Dr. Vaughn

experienced eight such flares in 2017.

Hartford's file reviews should be disregarded. They were the product of Hartford's

decision to termination. They arbitrarily rejected the record as a whole and   failed to consider

the comorbid conditions and progression of diseases.

### 6. Hartford continues to misrepresent and ignore the nature and impact of Dr. Vaughn's chronic, progressive comorbid diseases.

Hartford does not dispute Dr. Fourtounis' assessment of Dr. Vaughn's function during

the acute and recovery phases of a flare. *See* p.16, *supra* (AR 2214-15). Yet Hartford accepts

Dr. Shvarts' conclusions that the records "did not support that Plaintiff had restrictions or

limitations due to persistent asthma" Def. Resp., p. 35. *See also Id.,* p. 34.

Hartford ignores that Dr. Vaughn cannot care for herself during the acute phase of a flare

and has severe restrictions, documented by its own examiner in referring the claim to Hartford's

SIU. AR 53. Hartford ignores that while Dr. Vaughn can increase her physical activity as she

recovers from the acute phase of a flare, she remains disabled during the recovery phase from the

adverse effects of steroids on her behavior and cognition. *See* p. 16, *supra*. Hartford ignores

that she suffers four to five flares per quarter, as Hartford documented (AR 32), and ignores that

Dr. Fourtounis confirmed, and Dr. Rea agreed, her activities are is extremely limited during the

acute phase.  *Id.*  Hartford also fails to address the adverse effect of steroids on her behavior and

cognition.  *Id.*

### 7. Hartford misrepresents the 2017 medical record.

#### a. Hartford erroneously asserts lack of treatment in 2017 supported its termination.

Hartford misleadingly addresses the 2017 medical record, asserting Dr. Vaughn saw Dr.

Fourtounis "infrequent[ly]" and omitting that she frequently saw other physicians who treated

her comorbid conditions (Def. Resp., p. 22).

**January 2017:**  Dr. Vaughn was treated for a diabetic-related abscess. AR 1347-49.  She

was taking prednisone for an **asthma flare** at the time.  AR 1347.  Her **blood glucose** was in the

300s and she did not feel well.  *Id.*  Days later, on **January 23,**, Dr. Fourtounis noted her

**diabetes** was **not well controlled** because of chronic steroid use.  AR 1363.  Her HbA1c was

10.4%.[6]  AR 1364.  Her active problems included, *inter alia*, **diabetes**, **severe persistent asthma**

and **adverse effects of corticosteroids**.  AR 1363-65.

**February 2017**:  Dr. Vaughn had just finished taking **80 mg of prednisone for two**

**weeks** and had caught **another cold**.  AR 1374.  Allergist Dr. Ettinger noted she administered "2

weeks of Prednisone at 80 mg" and weans "twice a quarter".  *Id.*  He assessed **severe persistent**

**asthma**.  AR 1377.

**March 2017**:  **Elevated blood glucose levels** due to **repeated prednisone for asthma**

**flare**s and **severe persistent asthma**.  AR 1385 (Dr Fourtounis).

---

[6]The American Diabetes Association recommended value for the HbA1c blood test (a test that
indicates the average blood glucose level over the prior 2-3 months) for diabetics is 7%. AR
2215.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

**May 2017**:  Dr. Vaughn had suffered **two to three asthma flares since February 20** and was tapering prednisone.  She had increased allergy symptoms, including **wheezing** and **shortness of breath**.  Pulmonary tests revealed **mild obstruction**.  Her immunologist, Dr. Treat, assessed **severe asthma**.  AR 1408-09.

**June 2017**:  Orthopedic hand surgeon Dr. Krenek noted a **several-year history of progressive contractures, which had recurred in the dominant right hand** despite needle aponeurotomy, injections and splinting.  AR 1415.  She observed contractures and cords in the right 4th and 5th finger PIP joints and in the left 4th finger PIP joints and assessed recurring bilateral Dupuytren contractures.  AR 1419.  She noted surgery might be the best option, but that a **HbA1c of 10.4% was too elevated for surgery**.  *Id.*  She also stated complete correction was unlikely, there was no guarantee of success and recurrence was a risk.  *Id.*[7]

**October 2017**:  Dr. Vaughn reported to Dr. Fourtounis that her **diabetes "is difficult to control due to frequent steroid use** from Asthma flare ups" and he documented an HbA1c of 9.7%.  AR 1482-83.

**November 2017**: Dr. Vaughn saw medical providers **six times** for asthma, diabetes, contractures and dumping syndrome.  She also had two telephone encounters with providers regarding asthma, diabetes and dumping syndrome:

**November 1, 2017**:  Dietician Buck noted Dr. Vaughn was suffering four to fifteen episodes of dumping monthly, associated with dizziness, nausea, sweating and occasional vomiting, and had had a few sycopal episodes.  AR 1494.

---

[7] The fact Dr. Krenek did not place restrictions on Dr. Vaughn is insignificant. *See* Def. Resp., p. 9.  Dr. Vaughn sought her opinion regarding potential surgery in a single visit. She was not asked about vocational restrictions and it would not be expected that she would assess work capacity in this context. AR 1415-20. Hartford ignores the relevant point: Dr. Vaughn's health was too poor for surgery to be a viable option and surgery was risky and unlikely to be curative.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

**November 2, 2017**:  Occupational ("OT") Therapist Davenport (AR 1509-13) noted the **contractures had worsened** and were painful and limited finger extension and that **Dr. Vaughn had difficulty opening jars, writing, and typing**.  AR 1509-10.  The OT noted **there was not much OT could provide** and that Dr. Vaughn would have to modify her activities because of limited range of motion.  AR 1511.

**November 4, 2017**:  Dr. Treat documented persistent cough and a PEF of 175 at home.  Dr. Vaughn was using nebulizers and inhalers and was to start prednisone if her PEF fell to 150.  AR 1514.  Dr. Treat assessed **severe persistent asthma**.  AR 1516.  She also saw Dr. Fourtounis on November 4, for an **asthma flare**.  AR 1520-22.  He observed wheezing (AR 1521) and assessed **severe persistent asthma, type 1 diabetes with peripheral neuropathy, high risk sensory problem with the feet, and postgastric surgery syndrome**.  AR 1522.

**November 14, 2017**:  Dr. Fourtounis noted in a telephone encounter that Dr. Vaughn **could not work "in any capacity in a clinical setting".**  AR 1536.

**November 16, 2016**:  **Dr. Weissflog documented significant difficulty using the hands, especially the (dominant) right hand**, due to significant contractures.  He noted a chronically high HbA1c.  AR 1539.  He observed **widespread disease in both hands**.  *Id.*  He noted surgery was the only "realistic solution," but carried a high possibility of recurrence given the comorbidities.  AR 1540.

**November 21, 2017**:  Gastroenterologist Dr. Huber (AR 1542-47) documented that gas, dizziness, diaphoresis and nausea from dumping syndrome had been only partially helped by dietary trials.  AR 1542.  He assessed postgastric surgery syndrome and recommended Dr. Vaughn try an ileal brake (a feedback mechanism where fatty acids in the ileum trigger a

response to slow gut motility and gastric emptying) by taking vegetable oil before meals.  *Id*, 1546-47.

**November 29, 2017:**  Dr. Vaughn was struggling with **diaphoresis, lightheadedness and diarrhea, and had to lie down after eating**.  AR 1550.  The ileal brake had not helped.  Dr. Leger agreed (with Drs. Treat and Fourtounis) that Dr. Vaughn's "medical conditions preclude her ability to engage in clinical care of patients."  *Id*.

**December 7, 2017**:  **Dr. Vaughn was admitted to the hospital from the emergency room following two days with shortness of breath.**  AR 1569-73.  She had not improved with prednisone and a nebulizer and her blood glucose had been in the 500s with prednisone use.  AR 1569.  Her PEFs ranged between 210 and 225, blood glucose levels ranged between 325 and 425 and SpO2 values had ranged between 93% and 98% during admission.  AR 1562-65.  The 12/8/17 discharge diagnoses included:  **asthma exacerbation, severe persistent asthma, adverse effect of corticosteroid, type 1 diabetes with peripheral neuropathy, postoperative malabsorption, postgastric surgery syndrome and bilateral Dupuytren contractures**.  AR 1583-84.

**December 14, 2017**:  Dr. Fourtounis assessed **severe persistent asthma and high risk sensory problem** with the feet.  AR 1597-98.

**December 27, 2017:**  Dr. Fourtounis assessed **restless legs syndrome**.  AR 1604.[8]

Contrary to Hartford's assertion that Dr. Vaughn "attended only three office appointments with...Dr. Fourtounis, in 2017:  January 23, October 16, and November 6" (Def.

---

[8] Restless leg syndrome, which causes uncomfortable sensations in the legs and an irresistible urge to move them, is best characterized as a neurological sensory disorder. In most cases the cause is unknown and there is no cure.  www.ninds.nih.gov/Disorders /Patient-Caregiver-Education/Fact-Sheets/Restless-Legs (accessed April 8, 2019).

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

Resp., pp. 9-10), she actually saw Dr. Fourtounis, her internist who completed a fellowship in nephrology, six times on January 23 (AR 1363), March 6 (AR 1384), October 16 (AR 1482), November 6 (AR 1520), December 14 (AR 1597), and December 27 (AR 1603). She also spoke with him in a telephone encounter on November 14, 2017 (AR 1536) and e-mailed with him eight times. AR 2557-68. Dr. Fourtounis and Dr. Weissflog confirmed Dr. Vaughn's continuing disability on APS forms in 2017. AR 3375-76 (3/17), 1962-64 (11/17) (Dr. Fourtounis), AR 1965-67 (11/17) (Dr. Weissflog, confirming disability from Dupuytren contractures). *See* Pl. Mot., pp. 6-7.

Hartford arbitrarily disregarded Dr. Vaughn's 2017 medical record, which showed her continued disability and adopted its consultants' erroneous conclusions.

**b. Dr. Treat Fully Supported Plaintiff's Disability.**

Hartford asserts it "obtained an August 14, 2017 Attending Physician Statement (APS) from Dr. Treat...in which he opined that Plaintiff is able to work a 40 hours per week [when not experiencing a "flare"], lift up to 30 lbs., and perform unrestricted sitting, standing, and walking, and that she had the full use of her upper extremities." Def. Resp., pp. 8-9 (citing AR 3130-31). AR 3130-31 is not an APS. It is a Hartford's letter asking Dr. Treat to check "Yes" or "No" to indicate whether he agreed Dr. Vaughn could function as described by Hartford in the letter. AR 3130-31.

Dr. Treat's comment that Dr. Vaughn could work 40 hours per week **when not experiencing a flare** is in his subsequent letter to Hartford, dated February 12, 2018, which he wrote to clarify his August 2017 response:

> In my August 14, 2017 reply to Hartford's question regarding Dr. Vaughn's ability to function, I did not explain that my "yes" answer for the listed functions

only applied to Dr. Vaughn during the time she was not experiencing an asthma
flare **and was not on steroids.**

AR 2212 (emphasis added).

In discussing Dr. Treat's clarifying letter, Hartford omits his comment that his prior
"Yes" answer did not apply when Dr. Vaughn was on steroids. In addition, Hartford omits his
unequivocal statement in the letter that "severe persistent asthma and prolonged steroid use
precludes her from performing the duties of a primary care physician just on absenteeism alone."
AR 2213. *See* Def. Resp., p. 9. Again, Hartford understates the medical support for Dr.
Vaughn's claim.

> **8.  Hartford misleadingly asserts that Dr. Vaughn did not see an
> endocrinologist for her diabetes and that she self-treated asthma
> flares.**

Hartford asserts that Dr. Vaughn "did not see an endocrinologist regularly for her
uncontrolled diabetes." Def. Resp., p. 10. However, Dr. Fourtounis regularly treated her
diabetes and her endocrinologist, Dr. Prihoda, noted in February 2015 that she had good
awareness of "dosing kinetics, residual insulin, and cho [carbohydrate] counting," but that her
steroid therapy made it very hard to control her diabetes. AR 1660. Dr. Vaughn's dumping
syndrome also complicates her insulin therapy.

Dr. Fletcher asserted that Dr. Vaughn's average blood glucose ranges between 200-260
based upon her HbA1c values and that blood sugar levels in that range are controllable with
higher insulin doses and "guidance from a skilled primary care physician or endocrinologist."
AR 294. Dr. Vaughn was diagnosed with insulin dependent diabetes at age 13. As a primary
care physician, she had access to new treatment information and with over 40 years of
experience managing her own disease, she knows the nuances of insulin therapy.

**Plaintiff's Response In Opposition To Defendant's Cross-Motion
For Summary Judgment - Page 34 of 38**

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

Nor is there merit to Hartford's assertion Dr. Vaughn "self-treated" asthma flares at home, or the implication that emailing her physician when she had a flare suggests she was not severely ill.  Def. Resp., p. 9.  Dr. Vaughn did not "self-treat."  She took the medications her physicians prescribed in the manner they prescribed.  She sought treatment with Dr. Fourtounis (AR 1363, 1383, 1482, 1520, 1536 (tel. encounter), 1597, 1603),  Dr. Ettinger (AR 1374), and Dr. Treat (1408, 1514).  She went to the ER when she could not control her severe asthma.  AR 1569.  Fortunately, her medical training and clinical experience have allowed her to avoid *some* visits to doctor offices, avoiding exhausting travel and lessening her potential exposure to viruses that trigger her asthma flares.[9]

### 9.    Hartford did not analyze  Dr. Vaughn's capacity to perform her own occupation as a primary care physician.

Hartford Rehabilitation Case Management ("RCM") prepared a report in February 2016, which noted Dr. Vaughn's "functional ability, medical condition, and the employer's inability to provide accommodations due to unreliability" as functional barriers to her employment.  AR 68.  RCM noted Dr. Vaughn would not be "a reliable employee given her flares which could last 2 to 4 weeks per quarter" and were a "major barrier to a job search".  *Id.*  RCM concluded by stating it could not impact Dr. Vaughn's claim with accommodations or a job search given her "singular work history, functional ability and lack of [a] medical license."  *Id.*

Thus, RCM determined there were no accomodations potential employers could make that would allow Dr. Vaughn to resume her occupation as a primary care physician and that there was no occupation other than that of a primary care physician she could perform.  Hartford

---

[9] Dr. Vaughn noted that allergist Dr. Ettinger expressed gratefulness that she "was exposed to so many fewer viruses than when I worked."  AR 2225.

Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
(503) 223-7400

ignored these conclusions and instead relied on its file review consultants in asserting she could practice primary care full time.  AR 137-47.

Hartford also failed to conduct any occupational analysis prior to terminating Dr. Vaughn's claim or denying her appeal.  AR 4019-24, AR 137-47.  Hartford simply asserted she could work full time (AR 4023,146) in disregard of the record, including the fact NW Permanente had medically retired her four years earlier because she was unable to perform her occupational duties.  AR 3933.  In *Petrusich, supra*, 984 F. Supp. 2d, at 1124, this Court found that "Unum's failure to assess whether Petrusich was capable of performing her job was particularly troubling" given that her treating providers "specifically opined [she] was unable to return to work."  The Court concluded that "Unum's failure to perform this evaluation is further evidence that it abused its discretion when it denied Petrusich's claim for benefits."  *Id*.

### III.    CONCLUSION

Plaintiff's Motion addressed five factors that show Hartford's conflict influenced its claims handling and decision-making.  Pl. Mot., pp. 24-26.  Plaintiff's Response and Reply has addressed three additional factors:

1.  Hartford failed to produce to Plaintiff the policy or applicable 2013 Certificate, in violation of ERISA regulation, 29 C.F.R. § 2560. 503-1(h)(2)(iii).  Hartford also continues to make the meritless assertion the 2011 Certificate controls.

2.  Hartford withheld material information about its investigation for plan documents in discovery and misrepresented to Plaintiff and the Court that the 2011 Certificate was the controlling document.

3.  Hartford violated 29 C.F.R. § 2560.503-1(h)(2)(iv), which required Hartford to provide "a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim."

4.  Hartford failed to consider, and failed to provide its three consultants, Dr. Vaughn's complete ERISA appeal, yet relied on their opinions in denying her appeal.

Hartford also violated 29 C.F.R. § 2560.503-1(g)(1)(iii), by failing to describe "any additional material or information necessary" for Dr. Vaughn to perfect her claim or explain "why such material or information" was necessary in its October 2017 termination letter.  AR 4019-24.

Every aspect of Hartford's claim termination and appeal review were tainted.  Hartford and its consultants ignored, failed to consider, and misstated the record.  Hartford set up termination based on a sham assertion of inconsistencies in stated restrictions and limitations. Hartford misstated the results of its surveillance and interview.  Hartford accepted without question its file review consultants' patently erroneous assertions in denying Dr. Vaughn's appeal.  Hartford failed to analyze whether Dr. Vaughn could perform her occupation as a family practice physician given her worsening illnesses.  Hartford's termination of Dr. Vaughn's claim and denial her appeal was patently unreasonable and unsupported by the medical record.

For the foregoing reasons, Plaintiff respectfully requests that this Court grant Plaintiff's Motion for Summary Judgment and deny Defendant's Cross-Motion for Summary Judgment.

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

/ /

## CERTIFICATE OF COMPLIANCE

This brief complies with the applicable word-count limitation under LR 7-2(b) because it contains (10,993) words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

DATED: April 11, 2019

Respectfully Submitted,

s/ Megan E. Glor
Megan E. Glor, OSB No. 930178
megan@meganglor.com
Megan E. Glor, Attorneys at Law
707 NE Knott Street, Suite 101
Portland, OR  97212
Phone: (503) 223-7400
Fax: (503) 751-2071