IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


STEPHANIE S. VAUGHN,                     3:17-cv-01904-BR

          Plaintiff,                     OPINION AND ORDER

v.

HARTFORD LIFE AND ACCIDENT
INSURANCE COMPANY,

          Defendant.

**MEGAN E. GLOR**
**JOHN C. SHAW**
Megan E. Glor, Attorneys at Law, P.C.
707 N.E. Knott St., Suite 101
Portland, OR  97212
(503) 223-7400

          Attorneys for Plaintiff

**RUSSELL S. BUHITE**
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
1201 Third Ave., Suite 5150
Seattle, WA  98101
(206) 693-7052

          Attorneys for Defendant


**BROWN, Senior Judge.**

     This matter comes before the Court on Plaintiff Stephanie

S. Vaughn's Motion (#49) for Summary Judgment, Defendant

1 - OPINION AND ORDER

Hartford Life and Accident Insurance Company's Cross-Motion (#53) for Summary Judgment, and Plaintiff's Motion (#64) to Strike the Declaration (#63) of Russell S. Buhite in Support of Defendant's Reply. The Court concludes the record is sufficiently developed, and, therefore, oral argument is not required to resolve this matter.

For the reasons that follow, the Court **GRANTS** Plaintiff's Motion (#49) for Summary Judgment and **DENIES** Defendant's Motion (#53) for Summary Judgment. The Court also **DENIES as moot** Plaintiff's Motion (#64) to Strike.


<u>**BACKGROUND**</u>

**I.    Plaintiff Vaughn's Claims**

Vaughn alleges Hartford violated ERISA law when it terminated Vaughn's Long-Term Disability (LTD) benefits. Pursuant to 29 U.S.C. § 1332(a)(1)(B) Vaughn seeks reinstatement of her LTD benefits from Hartford under the disability plan (Plan) of her employer, Northwest Permanente, P.C. (Kaiser).

**II.  Procedural Facts**

Vaughn was employed by Kaiser as a family-practice physician. Hartford was the insurer for benefits under the group LTD Certificate of Insurance for Kaiser and administered Vaughn's claim for benefits.

In March 2013 Vaughn applied for LTD benefits on the basis that her asthma, prednisone treatment for her asthma, and juvenile onset diabetes mellitus rendered her disabled under the terms of the Plan.

In September 2013 Hartford approved Vaughn's claim effective August 12, 2013, based on its conclusion that Vaughn was unable to perform one or more of the essential duties of her occupation because of her disability. Hartford continued to pay benefits to Vaughn through October 28, 2017.

In March 2017 Hartford conducted a review of Vaughn's claim to determine whether she remained eligible for LTD benefits and referred Vaughn's claim to its Special Investigation Unit (SIU).

On October 19, 2017, following its investigation, Hartford terminated Vaughn's LTD benefits.

On November 29, 2017, Vaughn filed a Complaint in this Court against Hartford for violation of ERISA.

In February 2018 Vaughn appealed Hartford's termination of her LTD benefits.

On March 26, 2018, Hartford upheld its decision terminating Vaughn's LTD benefits.

On February 15, 2019, Vaughn filed a Motion (#49) for Summary Judgment in this case.

On March 6, 2019, Hartford filed a Cross-Motion (#53) for

Summary Judgment.

On May 10, 2019, Vaughn filed a Motion (#64) to Strike the Declaration (#63) of Russell S. Buhite in support of Hartford's Reply.

On May 24, 2019, all Motions were fully briefed, and the Court took this matter under advisement.


## STANDARDS

### I.    Summary Judgment in ERISA Cases

Although this matter is before the Court on cross-motions for summary judgment, the usual summary-judgment standard under Federal Rule of Civil Procedure 56 is not the appropriate standard in an ERISA action.  When reviewing a decision to deny or to terminate benefits, "a motion for summary judgment is, in most respects, merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute or material fact exists, do not apply."  *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929-30 (9th Cir. 2012).

### II.  ERISA Standard of Review

"When a plan does not confer discretion on the administrator 'to determine eligibility for benefits or to construe the terms of the plan,' a court must review the denial

of benefits *de novo*." *Abatie v. Alta Health & Life Ins. Co.*, 548 F.3d 955, 963 (9th Cir. 2006)(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). *De novo* is the default standard of review. *Id.* "But if the plan *does* confer discretionary authority as a matter of contractual agreement, then the standard of review shifts to abuse of discretion." *Id.* (emphasis in original). "For a plan to alter the standard of review from the default of *de novo* to the more lenient abuse of discretion, the plan must unambiguously provide discretion to the administrator." *Id.* (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1090 (9th Cir. 1999)).


## DISCUSSION

I.  **The standard of review in this case is *de novo*.**

The parties dispute the standard of review to be applied by the Court in this case.

Vaughn contends the standard of review is *de novo* on the ground that the applicable Plan contains a clear grant of discretionary authority to Hartford.

Hartford, in turn, contends the Plan vests it with discretionary authority to determine eligibility for benefits, and, therefore, the standard of review is abuse of discretion.

## A.    Background

Hartford contends the applicable Plan is governed by
the 2011 Certificate of Insurance, Revised January 1, 2011, that
is part of the Administrative Record (AR)(#43) filed in this
case.  AR 003169-80.[1]  The 2011 Certificate was issued by
Hartford and lists the "Policyholder" as Trustee of the Health
Care Industry Group Voluntary Life and Disability Insurance
Trust; the "Participating Employer" as Northwest Permanente,
P.C.; the "Policy Number" as GVL-16008; and the "Policy
Effective Date" as February 1, 2010.  AR 003152.  The 2011
Certificate provides:

> The provisions of the Participating Employer's
> coverage under The Policy, which are important to
> You, are summarized in this certificate
> consisting of this form and any additional forms
> which have been made a part of this certificate.
>
> * * *
>
> The Policy alone is the only contract under which
> payment will be made.  Any difference between The
> Policy and this certificate will be settled
> according to the provisions of The Policy on file
> with Us at Our home office.

AR 003152.  The "General Provisions" of the 2011 Certificate

---

[1]  The AR also contains a separate "Vaughn Policy" file
(Dkt. #43-14) that is separately Bates-numbered as 000001
through 000095.  The Court, however, will refer to the copy of
the 2011 Certificate that is part of the "Vaughn Claim" file of
the AR.

also provide:

> **Policy Interpretation:** *Who interprets the terms and conditions of The Policy?* We have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of The Policy. This provision applies where the interpretation of The Policy is governed by the Employee Retirement Income Security Act of 1974, as amended (ERISA).

AR 003169. The "ERISA Information" form that accompanies the 2011 Certificate provides:

> The benefits in your booklet-certificate (Booklet) are provided under a group insurance policy (Policy) issued by the Hartford Life and Accident Insurance Company (Insurance Company) and are subject to the Policy's terms and conditions. The Policy in incorporated into, and forms a part of, the Plan. The Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.

AR 003181.

According to Vaughn, however, her claim is governed by the 2013 Certificate of Insurance, Revised December 1, 2013, which does not grant Hartford discretionary authority. Vaughn, therefore, argues the standard of review is *de novo*. The Court notes the 2013 Certificate on which Vaughn relies is not part of the Administrative Record, but it is attached as Exhibit A to her Declaration (#50) in Support of Plaintiff's Motion for

7 — OPINION AND ORDER

Summary Judgment.  The 2013 Certificate indicates the Plan was "Revised December 1, 2013" and states "[t]he benefits described herein are those in effect as of December 1, 2013."  Ex. A at 8. Significantly, the "General Provisions" section of the 2013 Certificate does not contain language that grants Hartford the "discretion and authority to determine eligibility for benefits and interpret the terms of the policy."  Like the 2011 Certificate, however, the 2013 Certificate has an "ERISA Information" form that provides:  "The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy."  Ex. A at 36.

## B.  Analysis

### 1.  Applicable Plan.

In order to determine the proper standard of review, the Court must resolve which version of the Plan is applicable to Vaughn's claim.

The 2011 Certificate was the Plan in effect on March 4, 2013, when Vaughn applied for LTD benefits.  Vaughn, however, contends her claim for wrongful termination of her LTD benefits accrued on the day that her benefits were terminated, which the parties acknowledge occurred in November 2017.  Thus, Vaughn asserts the relevant Plan is the one in effect when

Hartford terminated Vaughn's LTD benefits in November 2017, which was the 2013 Certificate.

In *Grosz-Salomon v. Paul Revere Life Insurance Company* the Ninth Circuit determined which one of two policies controlled and the applicable standard of review. 237 F.3d 1154 (9th Cir. 2001). In *Grosz-Salomon* an employee challenged the disability insurer's termination of her benefits. The policy in effect when the employee applied for and was granted benefits did not contain a discretionary authority provision. Subsequently, the benefits plan was amended to include a discretionary authority provision and that plan was in effect when the insurer terminated the employee's benefits. The district court did not resolve whether the amended plan language controlled because the court concluded the abuse-of-discretion standard of review applied in any event and that the insurer's denial of the plaintiff's claim constituted an abuse of discretion.

Ultimately the Ninth Circuit held an ERISA cause of action based on a denial of benefits accrues at the time the benefits are denied; *i.e.*, the plaintiff's cause of action accrued under the policy in effect at the time her benefits were denied, and that policy determined the appropriate standard of review. *Id.* at 1159-61. *See also Bolton v. Constr. Laborers'*

*Pension Tr. for So. Cal.*, 56 F.3d 1055, 1058 (9th Cir. 1995)(under ERISA a widow's cause of action for spousal benefits accrued when she was denied those benefits).

Here, at the time that Hartford terminated Vaughn's benefits in 2017, the 2013 Certificate was the Plan in effect.  Thus, the Court concludes on this record that Vaughn's cause of action accrued under the 2013 Certificate, which does not grant Hartford the discretionary authority to terminate Vaughn's benefits.

   **2.    The ERISA Information is not part of the governing Plan.**

Hartford, nevertheless, argues regardless which Plan applies, the language in the "ERISA Information" accompanying both Certificates grants Hartford discretionary authority.  In response Vaughn contends the ERISA Information is not part of the Plan and should not be considered when determining whether Hartford had discretionary authority.

The Supreme Court has held a summary plan description that contains information "about the plan" is not itself "part of the plan." *Cigna Corp. v. Amara*, 563 U.S. 421, 436 (2011).

Here the ERISA Information sheet that accompanies both the 2011 Certificate and the 2013 Certificate is identical.

As the Supreme Court found in *Cigna*, however, the ERISA Information is merely a description of the Plan, but it is not part of the Plan.  As noted, the language of the actual Plan was modified in December 2013 and does not grant Hartford discretionary authority.

The Court notes, nevertheless, that even if it were to conclude the ERISA Information was part of the plan, there would be a conflict between the ERISA Information and the 2013 Certificate itself as to whether Hartford had discretionary authority.  Such an ambiguity does not meet the requirement that if a plan grants an insurer discretionary authority, it must grant such authority clearly and unambiguously.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  *See also Thomas v. Oregon Fruit Prod. Co.*, 228 F.3d 991, 993 (9th Cir. 2000)(same).

On this record, therefore, the Court finds the ERISA Information is not part of the Plan and does not govern the standard of review.

### 3.   The Policy and Trust Agreement produced late by Hartford is not applicable.

As part of its Cross-Motion Hartford produced for the first time a Policy and Trust Agreement (Policy).  *See* Decl. (#54-1) of Patricia M. Pfeifer.  Hartford asserts this Policy

provides Hartford with discretionary authority regarding Vaughn's claim.

Vaughn contends the Court should strike the Policy produced by Hartford on the grounds that it is not applicable to her claim, that the late production of the document contradicts Hartford's prior discovery responses that all applicable policies were contained in the Administrative Record, and that Hartford made false and misleading assertions and omissions regarding the existence of the Policy. *See* Pl.'s Reply (#59) at 9-10. Vaughn has also filed a separate Motion (#64) to Strike the Declaration (#63) of Russell Buhite related to production of the Policy.

As noted, the Policy produced by Hartford is not a part of the Administrative Record that Hartford consistently asserted contains "all responsive policy documents" applicable to Vaughn's claim. Hartford, however, now maintains the Policy was only recently discovered and was then immediately produced to Vaughn's counsel. In addition, Hartford contends "the Policy also clearly states that the Booklet-Certificates evidencing coverage are incorporated into the Policy and that the terms of the Booklet-Certificates will control as to coverage issues presented." Def.'s Cross-Motion (#53) at 16. Finally, Hartford also asserts the "LTD Certificate" (*i.e.*, the 2011 Certificate)

is the operative plan document and that it confers Hartford with the discretionary authority to construe and to interpret the Plan. *Id.* at 17.

The Court, however, has already concluded the 2013 Certificate rather than the 2011 Certificate is the operative plan and that the 2013 Certificate does not provide Hartford with discretionary authority.

Accordingly, the Court DENIES as moot Vaughn's Motion (#46) to Strike.

In summary, the Court concludes on this record that the applicable Plan is the 2013 Certificate; that the 2013 Certificate does not grant discretionary authority to Hartford; and, therefore, that the proper standard of review as to Hartford's termination of Vaughn's LTD benefits in 2017 is *de novo*.

## II. The Merits of Vaughn's Claim

### A. *De Novo* Standard of Review

Under the *de novo* standard of review the Court does not give deference to the plan administrator's decision, but "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie*, 458 F.3d at 963.

The plan administrator need not afford any deference

to the opinions of treating physicians when evaluating a claim. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 829-34 (2003). The insured bears the burden of demonstrating she was "disabled" from her occupation, and merely relying on a diagnosis will not by itself support a disability claim. *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 879-80 (9th Cir. 2004).

The plan administrator is allowed to terminate benefits if an insured is no longer "disabled" or fails to furnish proof of disability. AR 003161. Accordingly, to assure continuing eligibility the plan administrator can require the insured to show her continued disability and to submit periodic updates. *See Torres v. Reliance Standard Life Ins.*, No. 07-cv-202-BR, 2010 WL 276074, at *7 (D. Or. Jan. 15, 2010)(citing *Ellis v. Liberty Life Assur. Co. of Boston*, 394 F.3d 262, 274 (5th Cir. 2004)). In order to terminate benefits the plan administrator is not required to establish that the insured's condition improved after the plan administrator initially determined the insured was entitled to benefits. *Torres*, 2010 WL 276074, at *8.

## B. Background

The following facts are taken from the pleadings of the parties and the Administrative Record and are undisputed

unless otherwise indicated.

1.    **The Plan Requirements**.

The LTD Certificate describes the coverage provided under the Group Policy issued to participant employees of Kaiser, Vaughn's employer.  The LTD Certificate defines the following relevant terms:

> **Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:
>
> 1) Your Occupation during the Elimination Period; and
>
> 2) Your Occupation, following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-Disability Earnings."
>
> \* \* \*
>
> Your Disability must result from:
>
> 1) accidental bodily injury;
>
> 2) sickness;
>
> 3) Mental Illness;
>
> 4) Substance Abuse; or
>
> 5) pregnancy.
>
> Your failure to maintain a license to perform the duties of an occupation, alone, does not mean that You are Disabled.  You will not be considered Disabled solely because Your professional or occupational license or certification is suspended, revoked, restricted or surrendered.

\* \* \*

**Essential Duty** means a duty that:

    1) is substantial, not incidental;

    2) is fundamental or inherent to the occupation; and

    3) cannot be reasonably omitted or changed.

Your ability to work the number of hours in Your regularly scheduled work week is an Essential Duty.

Joint Statement of Agreed Material Facts (#46) at ¶¶ 13-14.

### 2. Vaughn's Initial Application for Benefits and Supporting Evidence.

As noted, Vaughn worked as a family-practice physician employed by Kaiser. As of the date of her disability claim Vaughn had a regularly scheduled work week of 20 hours. Plaintiff's last day of work was March 4, 2013. AR 003322.

On March 13, 2013, Vaughn and her physician managers met with Kaiser's Director of Human Resources, Deborah Hedges, to discuss Vaughn's return to work. In an email on March 15, 2013, Hedges stated: "It was agreed that given [Vaughn's] current health status and medication it would probably not be feasible to return her to direct patient care at this point." AR 003935.

On March 17, 2013, Kaiser's Physician Service

Area Director, Tony Daniels, M.D., stated:

> This is to confirm that you are not
> currently able to manage doing normal
> outpatient panel management based upon high
> absenteeism, secondary to your medical
> condition.  If your short and long term
> prognosis is not likely to improve, I do not
> anticipate you can effectively return to
> doing normal outpatient panel management.

AR 003933.

On March 21, 2013, Vaughn applied for LTD benefits.  AR 003899—900.  In her application Vaughn's treating internist, Andrea Matsumura, M.D., stated Vaughn's primary diagnosis was "chronic asthma (severe)" and "brittle insulin dependent diabetes mellitus."  AR 003899.  Dr. Matsumura reported Vaughn suffered from shortness of breath, fatigue, hyperglycemia, and irritability while on prednisone.  From her physical examinations of Vaughn, Dr. Matsumura found Vaughn also suffered from severe wheezing, increased heart and respiratory rate, and decreased spirometry values.  Dr. Matsumura noted Vaughn was intermittently ill and was treated with high-dose prednisone for her asthma flares, which occurred more than once per quarter.

Dr. Matsumura limited Vaughn to sitting for two hours, to standing for two hours, and to walking for four hours daily in a general workplace environment "only when not in a

flare or on injectable or oral steroids." AR 003900 (emphasis
in original). Dr. Matsumura stated these limitations were
"lifetime" and noted Vaughn has a psychiatric/cognitive
impairment and displays "angry/irritable combative behavior"
when taking steroids. *Id.*

In September 2013 Hartford approved Vaughn's LTD
claim effective August 31, 2013, based on Hartford's conclusion
that Vaughn was unable to perform one or more of the essential
duties of her occupation because of her disability. Joint
Statement of Agreed Material Facts (#46) at ¶ 5.

On April 3, 2014, Dr. Matsumura indicated
Vaughn's prognosis was "unchanged" and that Vaughn was "unable
to dependably work secondary to chronic medical condition.
Lifetime." AR 003519.

On October 31, 2014, Dr. Panos Fourtounis, one of
Vaughn's treating internists, completed an Attending Physician's
Statement of Functionality. AR 003531-32. Dr. Fourtounis
indicated Vaughn had a primary diagnosis of "severe persistent
asthma" and a secondary diagnosis of "uncontrolled insulin
dependent diabetes." AR at 003531. He noted "no change" in
Vaughn's restrictions and "lifetime" duration for those
restrictions. AR 003532.

On February 4, 2015, in response to Hartford's

inquiry, Dr. Fourtounis indicated Vaughn was unable to perform either sedentary or light work on either a full-time or a part-time basis because of the "severity of her symptoms and frequent flare ups [that] preclude her from being able to function consistently at any level."  AR 003695-96.

In a subsequent Physician's Statement on September 3, 2015, Dr. Fourtounis reiterated his diagnoses of asthma and diabetes and noted Vaughn had symptom flares of asthma every two or three months.  AR 003710.  He again noted there was not any change in her restrictions and indicated Vaughn had "cognitive effects from prednisone, so during flares (1-3 weeks) judgment poor."  AR 003711.

On October 28, 2015, Dr. Fourtounis responded to another inquiry from Hartford regarding Vaughn's ability to work.  Dr. Fourtounis again stated Vaughn was unable to perform light work on a full-time basis and that Vaughn continued to have issues with asthma flare-ups and chronic fatigue.  He also indicated Vaughn was "unable to perform her medical duties that are mostly cognitive [and] require stamina and cardiorespiratory fitness level[s] that she does not have."  AR 003505-06.

On March 6, 2017, Dr. Fourtounis completed another Physician's Statement regarding Vaughn's condition.  He repeated his diagnoses of asthma and diabetes and noted two

severe steroid-resistant flares that occurred in January and February.  AR 003376.  He indicated Vaughn's asthma was "severe recurrent" and that she had "adverse effects of corticosteroid."  AR 003376.  Dr. Fourtounis again noted Vaughn's condition had not changed, she continued to be intermittently ill, and her restrictions were "lifetime."  AR 003375.

Hartford approved and continued to pay Vaughn's LTD claim through October 18, 2017.  Joint Statement of Agreed Material Facts (#46) at ¶ 6.

### 3. Hartford's Investigation and Termination of Vaughn's Benefits.

As noted, Hartford conducted a review in 2017 to determine whether Vaughn remained eligible for benefits.  The matter was referred to Hartford's Special Investigative Unit (SIU) in March 2017.  Joint Statement of Agreed Material Facts (#46) at ¶¶ 7-8.  As part of its investigation, Hartford conducted video surveillance of Vaughn for two days in March 2017 and two days in April 2017.  Joint Statement of Agreed Material Facts (#46) at ¶ 9.

On May 12, 2017, Hartford conducted an in-person interview of Vaughn.  AR 004027-41.

On July 25, 2017, in response to an inquiry from Hartford regarding Vaughn's condition, Lucie Krenek, M.D., one

of Vaughn's treating physicians, indicated she was not providing any restrictions or limitations as to Vaughn's condition. AR 003120. On July 29, 2017, Jonathan Rettman, M.D., another one of Vaughn's treating physician, stated in response to Hartford's inquiry that he had not seen Vaughn since December 2015 and could not comment on her current functionality. AR 003123.

On August 14, 2017, as part of its review, Hartford obtained an Attending Physician's Statement from Justin Treat, D.O., Vaughn's treating immunologist. Dr. Treat stated Vaughn had the ability to work a 40-hour week (when not experiencing a "flare"); to lift up to 30 pounds; to perform unrestricted sitting, standing, and walking; and to use her upper extremities fully. AR 003130.

As part of its review of Vaughn's claim, Hartford referred Vaughn's file to an independent third-party vendor for a medical-records review. On September 12, 2017, Joseph Rea, M.D., Board Certified in Occupational Medicine, reviewed Vaughn's medical records and other materials, including an in-person interview report and the surveillance videos. AR 003133-137. Dr. Rea concluded:

> I would basically concur with the opinions of the other specialty physicians regarding functionality and result and limitations.

> Based on the unpredictable onset of
> asthmatic flares, there would be indication
> for limitations which would be, I believe,
> in line with Dr. Fourtounis's approach for
> bedrest and note to limit activity during
> the time of the flares. Absent flares,
> there appears to be, based on the clinical
> evidence available, normal physical findings
> along with reasonably normal mild-to-
> moderate activity levels . . . suggesting
> that during those normal and majority of
> times there would bel no indication for any
> significant physical impairment or resulting
> restriction or limitation.

AR 003136.

Based on this information, Hartford concluded

Vaughn no longer met the Plan definition of "disability" and

notified Vaughn on October 19, 2017, that it was terminating

Vaughn's claim for LTD benefits on that date. Joint Statement

of Agreed Material Facts (#46) at ¶ 10; AR 00155-60.

On November 6, 2017, Dr. Fourtounis completed

another Physician's Statement. AR 001962-64. In addition to

his continued diagnoses of asthma and diabetes, Dr. Fourtounis

indicated Vaughn was experiencing diabetic neuropathy, bilateral

Dupuytren's contractures, and dumping syndrome. AR 001962. He

also stated Vaughn would need lifelong treatment, she would be

limited to bedrest and brief "home walking" when she experienced

acute flares and was taking prednisone, and she would be limited

by her lung capacity and her other medical issues when she was
not experiencing flares or taking prednisone.  AR 001962-64.

On November 16, 2017, Thilo Weissflog, M.D.,
Vaughn's orthopedic hand specialist, prepared a Physician's
Statement and indicated Vaughn has limitations and restrictions
caused by Dupuytren contractures in both hands.  AR 001965.  He
noted Vaughn could not use her hands for fine manipulation
(fingering, keyboarding), that her grip was limited by pain, and
that her contractures had retrogressed and involved six of her
fingers.  AR 001966.  Dr. Weissflog also noted Vaughn was unable
to "type with proper form" and could "hunt and peck" with her
right hand slowly and with multiple errors.  AR 001967.
Dr. Weissflog stated Vaughn was unable to use her right hand to
examine patients (especially the abdomen, pelvic, and knees) or
to open jars/tubes and load syringes; lacked the strength and
fine motor control for joint injections; frequently dropped
objects (including samples, specimens, etc.) from both hands due
to lack of grip; had limited ability to wash her hands; was
limited in her driving due to "palmar pain"; and needed some
modification in order to pour from bottles and cartons.
AR 001967.

**4.  Vaughn's Appeal.**

In February 2018 Vaughn appealed Hartford's

termination of her LTD benefits.  Joint Statement of Agreed

Material Facts (#46) at ¶ 11.

On February 8, 2018, Dr. Fourtounis submitted a

statement in support of Vaughn's appeal.  AR 00214-18.

Dr. Fourtunis summarized Vaughn's medical condition as follows:

> Over the past 5 years, Dr. Vaughn has
> averaged a severe asthma flare every 1-2
> months that required prednisone and/or
> steroid nebulizer treatment for a minimum
> of 2-3 weeks to as longs as 6-8 week.
> Dr. Vaughn's steroid treatment, in turn,
> causes her to experience irritability,
> aggressiveness, hypomania, and lack of
> judgment.  Her steroid treatment also wreaks
> havoc with her diabetic management and
> causes uncontrollable hyperglycemia.

AR 002214.  He then described Vaughn's cycle of illness:

> During the acute phase of an asthma flare,
> which may last a week or more, Dr. Vaughn's
> wheezing, dyspnea, and high doses of
> prednisone (60-80 mg. daily) essentially
> limit her to bedrest and minimal household
> activity.  Once Dr. Vaughn begins to recover
> from the acute phase of a flare, she starts
> to taper her prednisone, which may take
> anywhere from 2-3 weeks to 6-8 weeks
> depending upon the severity of the flare and
> the response of the flare to the prednisone.
> As Dr. Vaughn recovers from the acute phase
> of an asthma flare and her dyspnea
> decreases, she is able to become more active
> physically, even though she may still be
> tapering the prednisone and still be
> experiencing the adverse prednisone effects.

AR 002214-15.  Dr. Fourtounis concluded his assessment of

Vaughn's condition as follows:

Overall, my assessment of Dr. Vaughn is that she became disabled in March 2013; her disabling conditions have not improved over time; and she continues to be disabled at present. Dr. Vaughn's restrictions [and] limitations vary depending on whether she is out of an asthma flare and steroid free or in an asthma flare and taking steroids. However, the frequency of Dr. Vaughn's severe asthma flares, her steroid treatment, her subsequent adverse personality and behavior changes caused by steroids and her fatigue from dyspnea and steroid-induced hyperglycemia result in an absenteeism rate that precludes her from performing her job as a primary care physician. In addition, since she initially became disabled, Dr. Vaughn has experienced a partial loss of hand function by Dupuytren's contractures and developed dumping syndrome. All of Dr. Vaughn's current conditions combine to make her present health status worse today than it was in March 2013, when Harford determine she was disabled and approved her long-term disability claim.

AR 002218.

On February 12, 2018, Dr. Treat submitted a statement to Hartford regarding Vaughn's disability in which he reported Vaughn had eight asthma flares in 2017 and was hospitalized for two days as a result of one of those flares. AR 002212-213. He noted Vaughn is bedbound for a few days for one or two weeks and homebound from one to four weeks when experiencing a flare. Dr. Treat stated Vaughn has "a chronic long-term disability from severe persistent asthma, adverse side effects from steroid treatment for her asthma flares, and

insulin dependent diabetes mellitus."  AR 00212.  Dr. Treat
concluded:  "Dr. Vaughn's severe persistent asthma and prolonged
steroid use precludes her from performing the duties of a
primary care physician just on absenteeism alone."  AR 002213.

In his statement to Hartford Dr. Treat also
explained an earlier opinion that he gave to Hartford on
August 14, 2017.  At that time Hartford had asked whether Vaughn
"has the functionality to perform activity up to 40 hours per
week which requires unrestricted sitting, standing and walking
and; [*sic*] allows for full use of the upper extremities, such as
for reaching, fingering and handling.  Lifting/carrying up to 30
pounds occasionally and up to 10 pounds on a more frequent
basis."  AR 003130.  In response to Hartford's inquiry Dr. Treat
marked the "yes" box on the form.  In his 2018 statement
Dr. Treat explained his "yes" answer for the listed functions
"only applied to Dr. Vaughn during the time she was not
experiencing an asthma flare and was not on steroids."
AR 002212.

On March 14, 2018, Hartford obtained independent
reviews of Vaughn's medical records from Anita Shavarts, M.D.,
an allergist and immunologist (AR 000277-286); Dana Fletcher,
D.O., an endocrinologist (AR 000287-295); and Trenton Gause,
M.D., an orthopedic surgeon (AR 000296-303).  Dr. Shavarts

focused on Vaughn's asthma and stated Vaughn has "severe persistent asthma and it has been difficult to manage" and that her condition is supported by the medical records. AR 000281. Dr. Shavarts acknowledged Vaughn had asthma flares five or six times per year, that each flare lasted two to three weeks, that Vaughn was "fully incapacitated during these flares," and that the flares were documented by her treating physicians. AR 000281. Despite these findings, Dr. Shavarts concluded "there is no objective evidence to support this." AR 000281. She concluded "the medical record does not support any consistent restrictions and limitations for Dr. Vaughn's severe persistent asthma as of 10/18/2017 to the present." AR 000283.

Dr. Fletcher focused on Vaughn's diabetes. Based solely on his review of the medical records and surveillance videos, Dr. Fletcher concluded "there is no objective evidence in [Vaughn's] chart notes to support that she had impaired cognition, agitation, aggression, or behaviors that would interfere with her ability to perform her job as a physician in a professional, acceptable manner." AR 000291. He stated Vaughn "could very well manage her blood sugars, even while on steroids, with higher doses of insulin and regular follow up and contact with her endocrinologist." AR 00291. Dr. Fletcher also concluded:

It is my opinion from an endocrinology
perspective that [Vaughn] is able to work on
a full time basis 40 hours per week without
restrictions or limitations from 10/18/2017
to present with the following exceptions:
She may need to take brief breaks of 5-10
minutes up to 3 times during an 8 hour
period . . . . She may also be absent from
work for 1-3 days at a time up to 4 times
per year (up to 12 days off per year) for
acute illness related to her asthma,
diabetes or sever mood changes that may
occur while taking prednisone.

AR 000292.

Dr. Gause reviewed Vaughn's medical records
regarding her Dupuytren's syndrome. AR 000296-303. He noted
the records documented the diagnosis of Dupuytren's disease, but
he stated: "While [Vaughn] would in fact have some mild
impairment as a result of the noted contractures, her condition
would not completely preclude her from functioning in the
occupational setting." AR 000302. Thus, all three physicians
concluded Vaughn was capable of a 40-hour work week without
restriction with periodic absences of one or two days quarterly
for acute "flares."

On March 26, 2018, Hartford upheld its decision to
terminate Vaughn's claim for LTD benefits. Joint Statement of
Agreed Material Facts (#46) at ¶ 12.

C. **Analysis**

The issue before the Court is whether, based on a *de*

*novo* review of the current record, Hartford's decision to terminate Vaughn's benefits in 2017 was proper.

Vaughn contends she is entitled to reinstatement of her LTD benefits on the grounds that Hartford (1) based its decision on misstatements regarding the nature and treatment of her asthma flare; (2) arbitrarily relied on the Hartford consultants' reviews of her medical records that were contrary to the medical records; (3) unreasonably dismissed evidence supporting her disability; (4) arbitrarily relied on surveillance videos to support termination of her benefits; (5) improperly imposed an objective standard of proof of disability; and (6) violated ERISA's regulations regarding a full and fair review of her claim.

Hartford, in turn, contends the medical evidence and claims investigation in 2017, including the surveillance videos, establish Vaughn was not restricted in her activities, and, therefore, Hartford's termination of Vaughn's benefits should be upheld. Hartford, however, concedes "the medical records, statements, and other materials submitted by [Vaughn] in support of [her initial] claim were sufficient to establish her inability to perform the material duties of her occupations through October 18, 2017." Def.'s Cross-Motion (#53) at 7.

### 1. Medical Evidence From Treating Physicians

The parties dispute whether the medical evidence supports Vaughn's continuing disability claim. Hartford contends Plaintiff's treating physicians were "equivocal" regarding her conditions and limitations. For example, Hartford points to Dr. Krenek's opinion that Vaughn did not have any restrictions or limitations in July 2017 resulting from the conditions for which Dr. Krenek was treating her. The Court notes, however, that Dr. Krenek is the only one of Vaughn's treating physicians who unconditionally opined Vaughn had the ability to work 40 hours per week. Although Hartford points to Dr. Treat's response in August 2017 that Vaughn had the functional ability to work 40 hours per week, in February 2018, as noted, Dr. Treat clarified his statement and explained he meant Vaughn had limitations only when she was "experiencing an asthma flare."

In contrast, Dr. Fourtounis, who had consistently treated Vaughn since 2013, carefully explained Vaughn's medical conditions, the necessary treatment, the cycle of recovery, and the limitations and restrictions as a result of her illnesses. Dr. Fourtounis concluded Vaughn's medical condition in 2018 "was worse . . . than it was in March 2013."

## 2. Hartford Consultants' Reviews of Vaughn's Medical Records

As noted, Hartford obtained three reviews of Vaughn's medical records following her appeal. None of these physicians examined Vaughn personally and each limited their review to only one of Vaughn's conditions in isolation without regard to the combined effects of her illnesses on her ability to work. In contrast, Vaughn's treating physicians documented Vaughn's ongoing conditions that significantly impaired her ability to perform her profession.

On *de novo* review of this record the Court concludes the treating physicians' opinions carry greater weight as to whether Vaughn was disabled through 2017.

## 3. Hartford's Video Surveillance of Vaughn

As noted, Hartford conducted video surveillance of Vaughn for two days in March 2017 and two days in April 2017. Hartford contends this surveillance shows Vaughn performing activities such as yard work, hiking, pushing equipment around her yard, driving, and entering and exiting cars without any observable distress, hesitation, or impairment.

Specifically, Hartford asserts the video of Vaughn on March 28, 2017, shows Vaughn doing yard work for about an hour. During this time Vaughn rolls a large garbage can to

the street and operates an aerating tool on her lawn that requires her to press down with her foot while grasping and twisting the tool repeatedly, tapping the tool, bending to pick up clumps of sod, putting the sod in a bucket, picking up the bucket, and carrying it to a garbage can.  She also stops to talk to a neighbor and removes her jacket.

Hartford also contends 15-minutes of video surveillance on April 21, 2017, shows Vaughn was more active than she claimed.  Although Hartford asserts the video shows Vaughn on a hike in the Columbia River Gorge for two hours with a friend, approximately four minutes of the video shows Vaughn at a trail head looking at a map and starting down a path and approximately one minute of the video shows Vaughn sometime later returning and getting into her car.  Thus, even though Hartford contends Vaughn "hiked" for "two hours," Hartford merely speculates because the video does not show Vaughn actually hiking for that long.  Ten minutes of the video show Vaughn doing yard work later that day.  Hartford also contends on April 21, 2017, Vaughn emailed her doctor that she was having an asthma flare.

Vaughn disputes Hartford's description of the surveillance videos and contends the four days of video surveillance actually show approximately one hour and 17.5

minutes of activity that creates "an impression Dr. Vaughn was continually engaged in activities, whereas the brief periods of activity recorded were actually broken up over time." Pl.'s Resp. (#58) at 15.

Video surveillance may be useful to document a claimant's actual rather than alleged capabilities, but the Court concludes the approximately 77 minutes of video surveillance of Vaughn's activities over four days fails to establish that she was not disabled or as disabled as she alleges. Although Hartford contends Vaughn was in the midst of an asthma flare on March 28, 2017, Vaughn points to records that show she experienced asthma symptoms on March 12, 2017; that she was not in an acute phase of an asthma flare; and that she experienced only mild symptoms on March 28, 2017. AR 00225, 002557-68. On April 21, 2017, Vaughn emailed Dr. Fourtounis that she thought her "current flare was controlled but this spring bloom is seeming to cause a relapse." AR 002564. Thus, contrary to Hartford's assertions, the surveillance videos do not demonstrate Vaughn was more active than she acknowledged nor that she was no longer disabled.

In summary, after *de novo* review of the current record, the Court concludes Hartford's decision to terminate Vaughn's LTD benefits is not supported by Vaughn's medical records, the

independent reviews of Vaughn's medical records, or the surveillance videos.  Accordingly, the Court concludes Vaughn is entitled to reinstatement of her LTD benefits effective from October 19, 2017.


## **CONCLUSION**

For these reasons, the Court **GRANTS** Plaintiff's Motion (#49) for Summary Judgment, **DENIES** Plaintiff's Motion (#64) to Strike **as moot, DENIES** Defendant's Motion (#53) for Summary Judgment, and enters Judgment in favor of Plaintiff.

IT IS SO ORDERED.

DATED this 12th day of June, 2019.


_____s/Anna J. Brown_____
ANNA J. BROWN
United States Senior District Judge